**IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA**

Gary A. Goldstein
Plaintiff, Case No:
v.

Pilgrim Caribbean Isle LLC;
Pilgrim Forest Park LLC;
Pilgrim Windtree LLC;
Pilgrim Coulter LLC;
Pilgrim Warwick LLC;
Pilgrim Coulter Owner LLC;
Pilgrim Warwick Owner LLC;
Pilgrim Windtree Owner LLC,
Overlook Managing Member LLC;
Portfolio 2 Managing Member LLC;
Atlas Holdings Investment LLC;
Consilient Holding Investments LLC;
Yacht Daddy LLC;
Saucer Sled LLC;
Mat Realty Ventures LLC;
Scranton Investments S.R.L.;
Downtown Property Ventures LLC;
Vandelay Mortgage Fund LLC;
North American Venture LTD;
Turtle Way LLC;
Tyler Atlas LLC;
Steven Ivankovich;
Dr. Olga Ivankovich;
Nancy Webber;
David Morris;
Rodney Balais; and
Daniel Lynch
Defendants.

**COMPLAINT FOR BREACH OF CONTRACT; QUANTUM MERUIT; UNJUST ENRICHMENT; CIVIL FRAUD; ABUSE OF PROCESS; EXTORTION; OBSTRUCTION OF JUSTICE; CONSPPIRACY AND AIDING AND ABETTING FRAUD; FRAUDULENT CONVEYANCE; SPECIFIC PERFORMANCE; REQUEST FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER.**

NOW COMES Plaintiff Gary A. Goldstein, hereinafter ("Plaintiff") and sues the defendants: Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLCLLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to collectively as ("Pilgrim" or "P-5") ;Overlook Managing Member LLC; ("Overlook) Portfolio 2 Managing Member LLC, (hereinafter referred to as ("P-2"); Atlas Holdings Investment LLC; Consilient Holding Investments LLC; hereinafter referred to as ("Consilient"); Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC (the owner of a condominium located at 401 North Wabash unit 55 A Chicago IL. Known as the "Trump Condominium"); Vandelay Mortgage Fund 1 LLC (Vandelay); Steven Ivankovich, individually; Dr Olga Ivankovich, individually; Nancy Webber individually, Tyler Atlas LLC; Turtle Way LLC; David Morris, individually; Rodney Balais, individually; North American Ventures Ltd; and David Lynch, individually.

## INTRODUCTION AND SUMMARY OF THE COMPLAINT

## PARTIES JURISDICTION AND VENUE

1 Plaintiff is an attorney admitted to the Maryland Bar on December 9, 1966. Plaintiff is admitted to numerous other courts including the United States Supreme Court, the United States Circuit Cout of Appeals for the 4th,11th, and 7th Circuits. Plaintiff is a resident of Palm Beach County, Florida. The engagement agreement, pursuant to its terms, required payment to Plaintiff in Palm Beach County, Florida. All other agreements to pay Plaintiff's legal fees were to occur in Palm Beach County, Florida. Plaintiff had

numerous meetings with the members and officers for many of the defendants in Palm Beach County, Florida.

2 The defendant "LLCs" are organized and incorporated limited liability companies in Delaware, Illinois, and Florida. Many of the defendants collectively are part of a Family Office known as the Atlas Group. The Atlas Group makes investments in single purpose LLCs that owns real estate, investment accounts, and personal property such as boats yachts, and boat manufacturing.

3 Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLCLLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to collectively as ("Pilgrim" or "P-5") regularly do business in Florida, and have owned during the period covered in this complaint apartment projects in Broward County, Florida, and Orlando, Florida, and through their managers and members, regularly do business in Palm Beach County, Florida.

4 Overlook Managing Member LLC ("Overlook") is a Delaware organized limited liability entity that regularly does business in Florida. It's former Manager, Steven Ivankovich, is a Florida resident, and resides in Miami Dade County, Florida. It is the owner of the membership interests of the P-5 LLC's and regularly does business in Palm Beach County, Florida. Its current manager is Mark Brown, who had numerous meetings with Plaintiff, lender representatives and borrowers in Palm Beach County, Florida.

5 Portfolio 2 Managing Member 2 LLC is a Delaware organized limited liability entity that regularly does business in Florida. It is a wholly owned subsidiary of P 2 Managing

Member LLC (a reorganized debtor in a chapter 11 case filed in the United States Bankruptcy Court for the Southern District of Florida).

6 Atlas Holdings Investment LLC is a Delaware organized limited liability entity that regularly does business in Florida. Its Manager and Member is a Florida resident.

7 Consilient Holding Investments LLC ("Consilient") is a Delaware organized limited liability entity that regularly does business in Florida. It is the owner of an 80% membership interest in the P-2 apartments that are located in Florida. Its Manager and Member is a Florida resident.

8 Yacht Daddy LLC is a company organized under the laws of Jamica. It is the owner of a 100 foot Sunseeker Yacht that is moored in Miami Dade and Broward County, Florida. Its beneficial owner is Steven Ivankovich, a Florida resident, and 100% of its membership interests were assigned to A&O Family LLC, a Florida organized limited company (also a chapter 11 debtor). It regularly does business in Florida.

9 Saucer Sled LLC is a Colorado organized limited liability company. It owns property known as 1102 Beeler Place Copper Mountain, Colorado, 80443 .The beneficial owner of the property is Steven Ivankovich, a Florida resident.

10 Mat Realty Ventures LLC is a Delaware organized limited liability entity. It regularly does business in Florida. It owns property known as 86600 Overseas Highway, in Monroe County, Florida and its beneficial owner is Steven Ivankovich, a Florida resident.

11 Scranton Investments S.R.L. is an entity organized under the laws of the Dominican Republic. It is the owner of real property knowns Punta Alma. The beneficial owner of the real property and "Scranton" is Steven Ivankovich, a Florida resident.

12 Downtown Property Ventures LLC (Downtown"); Is a limited liability entity that owns a condominium at 401 North Wabash, Unit 55A, Chicago, Illinois. The beneficial owner of Downtown is Steven Ivankovich, a Florida resident.

13 Vandelay Mortgage Fund 1 LLC ("Vandelay") is a Delaware Organized limited liability entity. It regularly does business in Florida. The beneficial owner of Vandelay is Steven Ivankovich, a Florida resident, although its membership interests are held in the name of North American Ventures LTD a Cayman organized entity.

14 Turtle Way LLC is a Florida LLC. It owns real property at 200 Waterway Road, Apt#208 Tequesta, Florida 33469, located in Palm Beach County, Florida.

15 Tyler Atlas LLC is a limited liability company organized under the laws of Illinois. One of its Managers was Steven Ivankovich, a Florida resident. It is one of the entities that entered into the engagement agreement with Plaintiff, a Florida resident. It committed tortious conduct directed to Plaintiff as a resident of Palm Beach County, Florida.

16 North American Ventures Ltd. is a Cayman organized limited liability entity, which is owned by Steven Ivankovich, a Florida resident. It regularly does business in Florida.

17 The individuals David Morris, Rodney Balais, Nancy Webber, and Dr. Olga Ivankovich are individuals who function as Steven Ivankovich's straw persons. They are co-conspirators in the conspiracy and fraudulent conveyances alleged herein. David Morris is a Florida resident, he resides in Palm Beach County, Florida. Rodney Balais is a Florida resident and resides in Broward County, Florida. He is the manager and sole member of Oceanforce Marine LLC ("Oceanforce"), a Florida organized limited liability entity. Mr. Balais and his Oceanforce are simply "bagman" for Steven Ivankovich. Their only function is to receive funds illegally appropriated by Steven Ivankovich and to use

those funds to pay Steven Ivnakovich's bill and support his lavish lifestyle. Nancy Webber is a resident of Illinois who regularly does business in Florida and is an officer of the Turtle Way LLC. Dr. Olga Ivankovich is a resident of Miami Dade County, Florida. As set forth more particularly in the complaint, the individual defendants aided and abetted Steven Ivankovich in bank fraud, bankruptcy fraud, elder abuse, obstruction of justice, conspired with and subordinated Steven Ivankovich's perjury, aided and abetted Steven Ivankovich making fraudulent conveyances to the detriment of the Plaintiff and other law firms retained by Plaintiff to represent many of the defendants, and Steven Ivankovich's creditors. Said individuals conspired with Steven Ivankovich to hide his assets, allowed Steven Ivankovich to impersonate his father Dr. Anthony Ivankovich, and withdraw millions of dollars from Dr. Anthony Ivnakovich's bank accounts known as The Royal Bank of Canada Wealth Management Account ending in [redacted] ("RBC"), and from Dr. Anthony Ivankovich's Roth IRA account known as RBC Capital Markets LLC Cust. Ending in [redacted]

18 David Lynch is an attorney who maintains a law firm in Chicago Illinois. Mr. Lynch, in conjunction with Steven Ivankovich and Nancy Webber, defamed Plaintiff by filing a false police report with Cook County law enforcement. Mr. Lynch, in a preplanned and targeted effort, in conjunction with Steven Ivankovich, attempted to use the threat of filing a police report to damage Plaintiff's reputation in order to extort Plaintiff to wire money into a secret bank account owned and controlled by Steven Ivankovich. Thereafter, in further obstructing justice, Mr. Lynch caused two frivolous legal proceedings to be filed against Plaintiff by defendant Tyler Atlas, but whose real party in interest is Steven Ivankovich.

Mr. Lynch had actual knowledge when he filed the complaint signed under the penalties of perjury by Nancy Webber, as Manager of Tyle Atlas LLC, that Nancy Webber was not a manager or member of Tyler Atlas LLC. Mr. Lynch nevertheless permitted and filed the perjurious complaint and perjurious affidavit. Mr. Lynch, when informed Nancy Webber had filed perjurious affidavits refused to withdraw the complaint "doubled down" by filing an unauthorized American Arbitration Association ("AAA") claim, and a second Tyler Atlas complaint against Plaintiff alleging Plaintiff committed malpractice by failing to take an appeal for Tyler Atlas. Mr. Lynch filed the malpractice complaint notwithstanding that Mr. Lynch knew then and there in truth and fact, Plaintiff had no authority to represent Tyler Atlas and that Mr. Lynch had actual knowledge that the Plaintiff was not counsel in the Tyler Atlas case upon which Mr. Lynch sued. Mr. Lynch knew, then and there Tyler Atlas was represented by counsel of record other than Plaintiff, but nonetheless, Mr. Lynch's conduct was done intentionally, willfully, and with malicious intent not to preserve and protect his alleged client, Tyler Atlas. Instead Mr. Lynch's conduct was willfully and knowingly done to unlawfully target Plaintiff, all for his real client Steven Ivankovich, as set forth herein, for the purpose(s) to obstruct justice, aid abet Steven Ivankovich's fraud, aid and abet Steven Ivankovich to circumvent existing injunctions, and to extort Plaintiff to be complicit in the torts and crimes being committed by Steven Ivankovich.[1]

19 Venue is proper in Palm Beach County, Florida . Plaintiff is a resident of Palm Beach County, Florida. The engagement agreement was executed in Palm Bech County Florida, and the payments required were to be made to Plaintiff in Palm Beach County, Florida.

[1] Mr. Lynch's tortious actions are not protected by the "litigation privilege" doctrine

20 This court has jurisdiction over the causes of action alleged in this complaint. The damages claimed exceed $50,000.

21 All conditions precedent to the filing of this complaint have been complied with.

## FACTS COMMON TO ALL COUNTS

22 The individual Steven Ivankovich is or was the Manager of many of the defendant LLCs. Although the LLCs corporate documents may have disclosed another person or LLC as a Member or Manager such as defendant Dr. Olga Ivankovich, or now deceased Dr. Anthony Ivankovich, Steven Ivankovich was the person in control of the LLCs; the person alleged in the complaint who converted LLC assets to his own personal use, and the principal who structured and implemented the actions alleged in the complaint.

23 In July 2021, Plaintiff commenced full time representation of the Atlas Group in the capacity as General Counsel. On September 13, 2022, the Atlas Group - specifically Pilgrim, including Overlook (the owner of Pilgrim single purpose entities membership interests); the P-2 entities including Atlas P-2 Managing Member LLC; and other LLCs, Ivankovich Family LLC, P-2 Management LLC and Tyler Atlas, executed an engagement letter retaining Plaintiff as General Counsel for all Atlas Group LLCs existing or formed in the future. A copy of the engagement agreement with the August 15, 2022, status report letter is attached hereto and incorporated herein as Plaintiff's composite Exhibit 1.[2]

---

[2] Many of the facts alleged herein are from public documents including injunctions, court orders, third party complaints, pleadings filed in multiple cases, and pleadings and orders docketed in the four chapter 11 cases for Ivankovich Family LLC; A&O Family LLC (FL), A&O Family LLC (IL) and P-2 filed in the United States Bankruptcy Court for the Southern District of Florida. Other documents that support Plaintiff's allegations may be subject to a privilege, although most privilege claims if they existed have been waived, or a claim of confidentiality. To

24 Pursuant to Plaintiff's obligations, he continued full time representation of all Atlas Group entities. In pending court matters the engagement letter granted Plaintiff the authority to act as "lead counsel" . *"To be clear my role will be as Lead Counsel and General Counsel for you and the LLC's. This means that I on behalf of the LLC's and you individually consult and direct all other lawyers of law firms engaged on the status matters or new matters that are added. I answer to you, and Mark Brown as applicable. Your execution of this engagement letter confirms my authority."*

25 Plaintiff was authorized to retain "local counsel" as required, and to represent the various LLCs in pending litigation. The "local counsel" would sign separate engagement letters with the LLC or entity who they were representing. Pursuant to the engagement letter, the fees billed by "local counsel" were required to be paid by the LLC or entity that they represented. Copies of local counsel invoices were generally provided to Plaintiff as General Counsel, and Plaintiff would forward the invoices of local counsel to be paid by the client.

26 As more specifically alleged hereinafter, defendants breached the engagement letter by systematically failing to pay local counsel fees, a pattern that occurred in almost every case for which local counsel was retained. Defendants refused to pay local counsel fees, and as a result, local counsel generally withdrew from representing the particular LLC.[3]

---

avoid any claim that an alleged privilege or confidentiality has been breached, Plaintiff intends to supplement the complaint by filing such documents under seal once an appropriate court order is entered.

[3] Plaintiff's invoices and his engagement letters with the relevant defendants will be produced as evidence or provided to the court for in camera review to protect the disclosure of any privileged information.

27 Plaintiff, from the commencement date of his employment through December 31, 2025, continued to represent many of the defendant LLCs on a full-time basis, devoting at a minimum, 40 hours per week of earned legal services.

28 The primary areas to which Plaintiff devoted substantial time evolved from preventing the forced sale of the P-2 properties by the "Galaxy PE" investor to the sale of the two Florida apartment buildings owned by P-2, on or about December 28, 2021. The net sales proceeds of $53,000,000 were distributed to entities controlled by Steven Ivankovich. The proceeds were maintained in various LLC names and deposited with Stifel Nicholas & Company ("Stifel").

29 The second primary area of General Counsel services arouse from the sale of two Florida properties owned by Special Purpose LLC's, known as the P-5 portfolio ("P-%"). The net proceeds of the sale in the amount of $35,000,000 was distributed to the Ivankovich Family LLC and A&O Family LLC (IL)[4].

30 Unknown to Plaintiff, Steven Ivankovich's creditors, and Steven Ivankovich's parents, Dr. Anthony Ivankovich and Dr. Olga Ivankovich, Steven Ivankovich did not use the sales proceeds to repay his parents investment in the LLCs.

31 Steven Ivankovich represented that the sale funds had been repaid to his parents' LLCs. Those representations, then believed to be true by Plaintiff, were untrue and known to be untrue by Steven Ivankovich when he made the false representations. It also was

[4] The foregoing facts are a matter of public record in several cases including the Cook County divorce case between Jeanette Ivankovich and Steven Ivankovich; ZZH/Lee v. Steven Ivankovich, in the United States District Court for the Northern District of IL; the four chapter 11 cases; the Delaware cases between Steven Ivankovich, Overlook and P-5 GRA LLC (an owner of a 7% membership interest in Overlook); and the case in the Circuit Court for Los Angeles County known as Township Capital LLC.

unknown to Plaintiff and local counsel engaged to litigate the sale disposition proceeds in three courts, The United States District Court for the Northern District of Illinois, the Circuit Court of Chancery of Delaware, and the Circuit Court for Los Angeles, California. Steven Ivankovich created two new LLCs, Ivankovich Family LLC and A&O Family LLC (IL). Steven Ivankovich owned 100% of the membership interests in Ivankovich Family LLC and A&O Family LLC (IL). Steven Ivankovich from each sale closing, diverted 100% of the net sales proceeds (minimum of $89,000,000) to wholly owned or controlled LLCs.[5]

32 Steven Ivankovich made numerous false, fraudulent, and perjurious statements that he used the sale proceeds to repay his parents investments. No funds were used by Steven Ivankovich to repay his parents or their LLCs. The tracing reports of Cohn Reznick L.L.P. engaged by the chapter 11 debtors to trace the sale proceeds, confirmed that the $89,000,000 in net sales proceeds and more than $100,000,000 in Ivankovich Family funds were taken by Steven Ivankovich and used as his personal "piggy bank". The funds were used by Steven Ivankovich for his personal pleasure and to acquire assets for himself. Steven Ivankovich disguised his actual ownership and control though the subterfuge of defendant LLCs that, notwithstanding the "paper title" of the LLC management or ownership Steven Ivankovich owned and controlled. The fiction that the LLCs were owned by other LLCs owned by Steven Ivankovich's parents or others was a fiction created by Steven Ivankovich to place the LLC assets beyond the reach of his personal creditors including Plaintiff, and numerous other law firms engaged to represent

[5] This fact is not confidential or privileged. In the Chapter 11 cases a CPA firm was retained as a financial advisor pursuant to an order entered by Bankruptcy Judge Hon. Laurel Issicof. The firm known as "CR" traced the sale proceeds and provided copies of the report to all counsel.

the LLCs pursuant to the Plaintiff's engagement agreement. All LLCs were the Alter Ego of Steven Ivankovich.

33 Every Court across the country that heard testimony concerning Steven Ivankovich's interest in the LLCs, and his use of LLC funds, concluded that Steven Ivankovich controlled 100% of the access to the cash accounts and used those accounts as his personal funds, and not for the benefit of the LLCs. The Courts' entered orders that the LLCs were Steven Ivankovich's "Alter Ego" or that the actual LLC funds were Steven Ivankovich assets and not assets of the LLCs. A copy of the opinion of the Honorable Sharron Johnson Coleman affirming the opinion of Judge Sidney Schenkier Ret who tried the case as Special Master is attached hereto and incorporated herein as Plaintiff's Exhibit 2.[6]

34 The Cook County divorce court, pursuant to an ex-parte motion filed by Jeanette Ivankovich entered an ex-parte Order appointing a Receiver for any LLC in which Steven Ivankovic may have had an interest, a copy of the court order appointing a Receiver is attached and incorporated herein as Plaintiff's Exhibit 3.

---

[6] Although the case is currently on appeal to the United States 7th Cir. Court of Appeals, the facts of Steven Ivankovich's appropriating the P-5 sale proceeds are not disputed and Steven Ivankovich's reply brief adopted the LLC reply brief which does not dispute the finding of fact of Steven Ivankovich's taking the P-5 sale proceeds and using them for personal acquisitions and personal expenses. The LLC reply brief, suggests that the LLCs have a cause of action against Steven Ivankovich for his theft. On October 20, 2026 the United States Court of Appeals for the 7th Circuit affirmed the order of the United States District Court for the Northern District of Il. The opinion concludes that the escrowed Walker & Dunlop funds were assets of Steven Ivankovich, and basis that decision on Steven's total lack of credibility and conclude that had Walker Dunlop wired the funds to the P-5 LLCs Steven would have not used the funds to pay the taxes and insurance and just would have used those fund for his own self -interest. The opinion is attached to composite exhibit 2.

35 The Cook County divorce court also tried a sanctions petition against Steven Ivankovic and the Fields law firm, the law firm originally representing Steven Ivankovic's in the Cook County divorce case. The court entered an order granting sanctions against Steven Ivankovic's in the amount of $370.000, and sanctions against the Fields law firm in the amount of $70,000. The basis of the sanctions was Steven Ivankovic's perjurious testimony, and the Fields law firm failure to conduct its due diligence allowing Steven Ivankovic to testify falsely and to file pleadings relying upon their client Steven Ivankovic's statements that minimum due diligence would have disclosed to be false. The court opinion and order is attached hereto and incorporated herein as Plaintiff's Exhibit 5. The judgement against Steven Ivankovic's remains unpaid.

36 There were numerous adverse claims made by third parties alleging an interest in all or a portion of the net sales funds received by related LLCs. Those claims involved the "California Litigation", where a minority member of P-2 demanded 20% of the net $53,000,000 sales price plus prejudgment interest legal fees and costs. The claims of a minority member of Overlook demanded at a minimum a 7% distribution of the $35,000,000 net sales proceeds.

37 Other claims seeking all or part of the $89,000,000 net sales recovery were claims made by Jeanette Ivankovich in a divorce proceeding in Cook County, Illinois. Steve Ivankovichs' other creditor claims, including the claims of ZZH / Peter Lee, arising from a judgment entered against Steve Ivankovich in an amount exceeding $4,500,000 in the United States District Court for the Northern District of Illinois.

38 In the domestic litigation Steven Ivankovich's conduct resulted in him being held in contempt of court multiple times for his refusal to comply with support orders.

39 To protect the assets of the defendant LLCs, Plaintiff worked with Steven Ivaniovich's criminal counsel and drafted for their review many pleadings including the writ of habeas corpus. Plaintiff was requested to provide these services by Defendant Dr. Olga Ivankovich, to which Dr. Ivankovich agreed to pay all of Plaintiff's accrued and earned legal fees. The agreement was confirmed in string emails in May 2025. Plaintiff advised Dr. Olga Ivankovich he was owed in excess of $1,000,000 and intended to withdraw as LLC counsel if arrangements were not made to pay the past earned and due fees, and a minimum "retainer" of $25,000 per month until a liquidity event occurred such as a sale or refinancing of the three Texas properties owned by defendants Pilgrim Windtree Owner LLC, Pilgrim Coulter Owner LLC, and Pilgrim Warwick Owner LLC, or other liquidity event.

40 Defendant Dr. Olga Ivankovich agreed to the payment of Plaintiff's earned and accrued legal fees. Relying upon defendant Dr. Olga Ivankovich's agreement to pay said fees, Plaintiff did not withdraw and continued his representation.

41 In the domestic litigation, as a result of Steven Ivanovich's conduct, a temporary restraining order was entered, restricting all LLC accounts held by Celedon Financial Services. Exhibit 5 The TRO froze all Chase bank accounts that Steven Ivanocivh was an authorized signature. This prevented any operating entity, including the three Pilgrim Texas properties from operating or even making their payroll. The TRO restricted the use of the Celedon accounts. Celedon accounts on the date the "TRO" was entered were in the names of A&O Family LLC (Fl), A&O Family LLC (IL) , Ivankovich Family LLC, and Portfolio 2 Managing Member LLC.

**The Four Chapter 11 Cases:**

42 The entities known hereinafter as ("Debtor's") filed for chapter 11 relief in June 2024, in the United States Bankruptcy Court for the Southern District of Florida. Plaintiff represented debtors in filing chapter 11 petitions upon the direction of Steven Ivankovich.

43 The necessity for filing the four chapter 11 petitions resulted from Steven Ivankovich's contemptuous conduct in the divorce case. The divorce court judge entered a preliminary injunction freezing all Celedon accounts and requiring Celedon to liquidate the accounts to satisfy the outstanding support judgments entered against Steven Ivankovich. The Preliminary Injunction made specific findings of fact that all LLC's were Steve Ivankovich's alter- egos. Steven Ivankovich alleged that he had no membership interest in any LLC and was supported by his parents. In other testimony, including a deposition in aid of execution before Hon. Judge Sharron Coleman, Steven Ivankovich testified he had no assets, no bank accounts, no money or securities of any kind, used his father's credit card, lived in his parents' home in Key Biscayne, Florida, did not own a car, took Uber ride-sharing using his father's credit card, did not have a job, did not work, and just spent his time watching girls on the beach.[7]

44 Steven Ivankovich's mother, defendant Dr. Olga Ivankovich, testified at the preliminary injunction hearing. After listening to testimony from Dr. Olga Ivankovich, the Court's Preliminary Injunction included a factual finding that Steven Ivankovich's mother, Dr. Olga Ivankovich, was not credible concerning her ownership and control of the LLC's.

[7] A Transcript of the testimony will be filed in the case under separate cover.

The Preliminary Injunction is attached hereto and incorporated herein as Plaintiff's Exhibit 6.

45 Plaintiff, as requested by the debtors in possession ("DIP") counsel, continued to represent debtors and the board of directors through the entire chapter 11 process. A copy of DIP counsel's application to employ Plaintiff is attached hereto and incorporated herein as Plaintiff's Exhibit 7.[8]

46 In the chapter 11, the DIP were represented by the Akerman law firm, and Eyal Berger, Esquire, as DIP counsel. Akerman engaged Cohn Reznick ("CR") as CPA professionals to trace the investments into the LLC's and the disbursements made by the LLC's including an itemization of "assets" purchased using net sale proceeds, or lines of credit for the LLC's including "loans" by Dr Anthony Ivankovich or Dr . Olga Ivankovich used to pay their son's Steven Ivankovich's expenses, credit cards, and/or purchases of other assets. A copy of the CR tracing reports will be filed subsequently under seal.

47 In order to avoid the allegation that Steven Ivankovich controlled all disbursements, regardless of the legal composition of the particular LLC, Steven Ivankovich withdrew as Manager of all LLCs. Steven Ivankovich's was removed from any and all authority, including access to any accounts maintained by the debtors in Celedon and RBC.

48 Steven Ivankovich resigned as Manager and Member of P-5 and Overlook.

49 Through an agreement known as the Chief Restructuring Agreement ("CRA"), Mark Brown was granted sole and exclusive authority to act for the LLCs. A copy of the CRA will be filed separately under seal.

---

[8] The application was not filed due to Plaintiff's representation of many Atlas Group LLCs in addition to the debtors. However, Plaintiff continued throughout the chapter 11 cases to perform the services outlined in the application.

50 In order to establish that the LLCs operated free and clear of any interest or control by Steven Ivankovich, as an LLC member or LLC manager, Steven Ivankovich executed Resolutions confirming Mark Brown's authority to act for all LLCs. To protect the integrity of the Resolutions, Mr. Brown could only be terminated for cause - the cause required for termination was gross negligence, fraud or similar "bad boy" conduct. A copy of the Resolution will be filed under seal.

51 Plaintiff, authorized by Steven Ivankovich and Mark Brown, represented debtor LLCs, P-5, P-2, and Yacht Daddy LLCs throughout all chapter 11 cases. Pursuant to Plaintiff's engagement letter, the CRA agreement with Mr. Brown, the authority granted in the Resolutions, the authority granted in the Titan Financial Services LLC contracts, the authority contained in the chapter 11 Plan, and at the specific request of Dr. Olga Ivankovich, Plaintiff continued as counsel for all LLCs, including the debtors and the pre and post confirmation of the debtor's board of directors. All pleadings, claim objections, settlement discussions, creditor claim objections, the plan, disclosure statements, preparation for a significant number of multiple hearings, preparation and discovery for the confirmation hearing, were all reviewed by Plaintiff, with counsel for the DIPs, Eyal Berger, Esquire, David Rosendorf, Esquire, counsel for Drs. Olga and Anthony Ivankovich, and bankruptcy counsel for Steven Ivankovich.

52 In the chapter 11, DIP counsel and counsel for Township Capital agreed to a partial "stay relief". Meaning, the case pending in California would not be stayed by the chapter 11 and a jury trial in California would be had. Plaintiff remained lead counsel for the cases.

53 Township Capital LLC filed a $400,000,000 million dollar claim against the chapter 11 debtors. Plaintiff assisted DIP counsel in filing objections to the Township claim.

54 Because of Plaintiff's work, the claim was amended from a $400,000,000 million dollar claim to $40,000,000. By agreement between Township Capital bankruptcy counsel and DIP counsel, the litigation on the claim liability was not tried as a claim objection in bankruptcy. Plaintiff, admitted as pro-hac-vice trial lead counsel in the Los Angeles, California court, was tasked with preparing for a ten day jury trial, and actually trying the Township Capital case. Plaintiff took on this onerous and extensive burden because he was promised full, complete and earned legal fees by defendants. This was an extensive burden as Plaintiff anticipated the claim objection would be tried in the bankruptcy case.

55 Plaintiff attempted to solicit trial assistance from Steven Ivankovich's DIP bankruptcy counsel Akerman, and David Rosendorf, Esq., bankruptcy counsel for Defendants Dr. Olga Ivankovich and Dr. Anthnoy Ivankovich. No other counsel, other than Plaintiff entered he/his/their appearance for failure by Steven Ivankovich, Dr. Olga Ivankovich and Dr. Anthnoy Ivankovich, to pay a legal fee retainer of $300,000-$500,000.

56 Plaintiff was additionally tasked with preparing and trying the Township Capital case as lead counsel. This was yet another extraordinary legal service for Plaintiff, a sole practitioner, who originally agreed to represent the LLCs as General Counsel. Plaintiff agreed to continue representing defendants in the Township Capital case relying upon the representations of Steven Ivankovich, Dr. Olga Ivankovich, Mark Brown and the three P-5 LLCs, that Plaintiff would be paid his past due, accrued, accruing, and earned legal fees for his work outlined above.

57 Plaintiff relied upon all above representations to his detriment. Had the representation not been made, Plaintiff would be paid for the earned and lawfully due attorney fees. Had the above promises not been made and relied upon, Plaintiff would have withdrawn as

counsel in all matters. Instead, based upon the above listed assurances to pay Plaintiff, Plaintiff provided earned, accrued and lawful legal services to which Defendants have reaped the benefits without paying Plaintiff.

58 Plaintiff, as lead counsel, was tasked with litigating the Township Capital case. As a practical matter, this meant Plaintiff was counsel for all LLCs including P2 and Portfolio 2 Managing Member LLC, which still had $7,000,000 in sale proceeds in an account maintained initially with Celadon and then with RBC. DIP counsel also tasked Plaintiff to participate in arbitration before the Honorable Bankruptcy Judge Paul Hyman (Ret), who agreed to arbitrate the Township Capital claim filed in the chapter 11 cases.

59 Plaintiff was also tasked with litigating the interests of Gary Romaniello, who through an LLC, alleged a 7 % membership interest if the P-5 portfolio. Eventually, in the chapter 11 matter, a settlement was agreed upon between the debtors and P-5 GRA LLC, the alleged owner of a 7% membership in the P-5 portfolio. The settlement was incorporated into the confirmed chapter 11 plan. A copy of the chapter 11 plan, disclosure statement and order confirming the plan will be filed under separate cover.

60 Plaintiff was also tasked with coordinating the debtor and related parties tax returns prepared by Andy Hamm (court appointed CPA), to prepare tax returns for the DIP 's, including K-1's. When DIP counsel was concerned with the deposition testimony of Andy Hamm, DIP counsel requested Plaintiff assist in clarifying the errors made by Andy Hamm in the tax returns.

61 The filing of the debtors' tax returns was critical in order to secure Plan confirmation. No tax returns had been filed by any P-2 or P-5 entity since 2019. The gross sales price of $420,000,000 was not disclosed on any tax return, nor was any pass thru tax liability

accounted for or paid. The pattern of receiving income, intentionally not filing tax returns, and never paying any income tax on income or real estate sale profits was and is a continuing pattern of fraud and income tax evasion by Steven Ivankovich. It has been estimated by CPA Andy Hamm that Steven Ivankovich, the person who received the proceeds from the sale of the four apartment complexes owned by P-2 and P-5, has a pass-through unpaid income tax liability on $57,000,000 arising from the sales of the P-2 and P-5 properties.

62 Plaintiff was the contact person for the chapter 11 board of directors, consisting of Dr. Olga Ivankovich, Nanny Webber, and Mark Brown. Plaintiff was tasked with coordinating the flow of information required by CR to prepare the tracing report.

**Description and History of the Debtors' Businesses, Assets and Sources of Plan Funding and Plan Guarantors Steven Ivankovich creation of North American Ventures Ltd a company organized under the law of Grand Cayman to defraud his parents, Plaintiff and his creditors. Background of pattern of fraud, and criminal activity to steal sale proceeds of $89,000,000, defraud Plaintiff, and other creditors, to evade income taxes, make fraudulent conveyances; obstruct justice; launder money; and extort Plaintiff**

63 Prior to the Petition Date, debtors were all directly or indirectly engaged in the investment business as part of a family office founded by Drs. Anthony and Olga Ivankovich, who are the managers of Debtor A&O Family (FL).

64 Steven Ivankovich, the son of Drs. Anthony and Olga Ivankovich, was the manager of Debtors Atlas P2, Ivankovich Family LLC, and A&O Family (IL). Drs. Anthony and Olga Ivankovich, individually and through their trusts, own 99.25% of A&O Family (FL). Dr. Anthony Ivankovich indirectly owns 80% of Debtor Atlas P2. Debtor Ivankovich Family LLC and A&O Family (IL) are owned by North American Property Ventures Ltd., a Grand Cayman Company ("North American")

65 Steven Ivankovich, in December 2022, signed an agreement called a Contribution and Exchange Agreement through which Steven Ivankovich attempted to transfer to North American in consideration for his parents' forgiveness of debt, his membership interests in all LLCs he owned. At the time of the transfer, Steven Ivankovich was insolvent.

66 Although Steven Ivankovich made numerous representations that North American Ventures Ltd., the Grand Cayman Company he incorporated, was not owned by Steven Ivankovich, but owned by a Grand Cayman Trust, known as the Ivankovich Family Trust, this is false. Steven Ivankovich statements made under the penalties of perjury that the owners of 100 % of the membership interests in North American Ventures Ltd. is false. The statements are perjurious and evidence a pattern of criminal activity intended to place his assets beyond the reach of his creditors, including Plaintiff. This pattern of criminal activity, perjury, and false statements, also stripped said assets from his parents.

67 Dr. Olga Ivankovich was informed that Steven Ivankovich was accessing the bank accounts of Dr. Anthony Ivanovich and using credit cards in Dr. Anthony Ivankovich's name. Dr. Olga Ivankovich was advised by her attorney to change the passcodes on said accounts and take other actions to prevent disbursements from the accounts not actually signed and authorized by Dr. Anthony Ivankovich. During this period, Dr. Anthony Ivankovich was physically impaired and not able to sign his name, communicate with personnel with RBC, or sign any document authorizing a transfer or disbursement of funds from any account.[9]

[9] Dr. Anthony Ivankovich was ordered to appear by zoom and testify during the preliminary injunction hearing in the Cook County divorce case. Due to his physical condition, his attempt to testify resulted in the Judge determining that Dr. Ivankovich's physical infirmity rendered him incompetent to testify. A copy of the transcript of same is available for Court review.

68 Defendant Nancy Webber was notified that only Dr. Anthony Ivankovich had access to the RBC accounts referenced herein, and she, as the contact person with RBC, should have notified RBC that any disbursement from said accounts was not authorized by Dr. Anthony Ivankovich and must be declined; but Ms. Webber failed to do so.

69 Defendant Dr. Olga Ivankovich, either as a victim of elder abuse or as a co-conspirator with Steven Ivankovich and the other individual defendants Nancy Webber, David Morris, Rodney Bailais, and Steven Ivankovich, aided and abetted Steven Ivankovich in unlawfully stripping / draining the RBC accounts.

70 This fraud and elder abuse of Dr. Anthony Ivankovich prevented those funds from being used to pay the accrued and lawfully earned legal fees due and owing Plaintiff, plus legal fees owed at least ten other law firms retained as "local counsel" pursuant to the Engagement Agreement and said law firms own engagement agreements.

71 This fraud was one of many reasons Plaintiff refused to wire the Tyler Atlas settlement funds to an unknown bank account that Steven Ivanankovich controlled.

72 P-5 funded a portfolio of multi-family properties known as the "P-5 Portfolio" which were organized and operated through limited liability special purpose entities that owned and developed five apartment complexes identified as: (1) Caribbean Isle, located at 3503 Caribbean Isle, Kissimmee, FL; (2) Forest Park, located at 2829 S. Oakland Forest Drive, Oakland Park, FL; (3) The Warwick, located at 2400 Arrowhead Drive, Abilene, TX; (4) Coulter Landing, located at 7208 S.W. 34th Ave., Amarillo, TX; and (5) Wind Tree, located at 3631 Brennan Blvd, Amarillo, TX.

73 In April 2022, Caribbean Isle and Forest Park were both sold to an unrelated third party, resulting in approximately $35,000,000 net proceeds. In connection with the closing, the

first mortgage holder on all five properties, Walker & Dunlop Commercial Property Funding, LLC ("Walker & Dunlop") was fully satisfied. Walker & Dunlop had control of an escrow account to pay for real estate taxes, insurance, and reserves for the P-5 Portfolio properties, which contained approximately $1,544,549 at closing. Though the escrow account was required to be turned over at closing to the special purpose entities operating the remaining properties in P-5 Portfolio, the escrow account was frozen in connection with litigation by a judgment creditor of Steven Ivankovich.

74 Each of the Texas apartment complexes are owned by a special purpose limited liability company. The record owners of The Warwick, Coulter Landing, and Wind Tree are Pilgrim Warwick Owner LLC, Pilgrim Coulter Owner LLC, and Pilgrim Windtree Owner LLC, respectively (the "P-5 Record Owners"). The specific description and disclosures relating to the P-5 Portfolio is described in the debtors Motion for Order Authorizing Use of Cash Collateral. Docket No. 149. ("Cash Collateral Motion").

75 Steven Ivankovich dispute with the ZZH/Lee creditors prevented Walker & Dunlop from disbursing the taxes and insurance escrow deposits to the P-5 LLCs. Those entities lacked the cash flow to pay these bills and debts owed to other lien creditors. Steven Ivankovich stole all sale proceeds and used same to acquire personal assets and support his lavish lifestyle, all while leaving no available funds to avoid a creditor or tax sale of the three Texas properties. Steven Ivankovich's continued breach of his fiduciary duties is part of the pattern of continued criminal activity that's remains ongoing to this date.

76 Plaintiff was tasked with representing the P-5 LLCs in the Special Master trial wherein the P-5 LLCs were attempting to recover the $1,500,000 that Walker Dunlop had

deposited in the court registry for the United States District Court for the Northern District of Illinois. Jason Wandner, Esquire, represented Steven Ivankovich.

77 Plaintiff notified Mark Brown and Steven Ivankovich that he would not try the case unless there was an agreement to pay Plaintiff's past due and lawfully earned legal fees of approximately $1,300,000. There were no available funds to pay Plaintiff. The parties agreed that the P-5 LLCs would assign Plaintiff a partial security for past due and lawfully earned legal fees the Walker Dunlop funds deposited with the court. A formal assignment of funds was executed. Based upon the assurances that Plaintiff's fees would be paid from a liquidity event, including a recovery of the Walker and Dunlap funds, Plaintiff didn't withdraw, and tried the case. Ironically, Steven Ivankovich testified as a hostile witness. The Special Master found and determined Steven Ivankovich lacked credibility. The Walker and Dunlap assets were treated as Steven Ivankovich's assets.

78 To save the Texas properties from a forced creditor or tax sale, Plaintiff requested and worked with DIP counsel to structure a loan by the DIP A&O Family LLC (FL) to the three Pilgrim entities. Had the loan not been obtained, the three Texas properties would have been sold for past due real estate taxes, or by creditor(s) who had recorded judgments liens against the property. Mark Brown was designated to be the person in charge of the renovations and compliance with the loan conditions required by the bankruptcy order authorizing the loan. Plaintiff represented the P-5 borrowers, prepared all closing documents, and directed all closing matters.

79 Steven Ivankovich attempted to divert the loan proceeds through subterfuge, intending to use the loan proceeds to support his lavish lifestyle. Mark Brown and Plaintiff prevented Steven Ivankovich's attempt to divert the loan proceeds.

80 Although the DIP loan was required to be repaid by December 31, 2025, the loan has not been repaid and is past due, a pattern of criminal activity and fraud by Steven Ivankovich, a de-facto control of reorganized debtors. He also is in de-facto control of the three Texas properties, asserts control by intimidation, threats of legal action, and payments made to his co-conspirators Nancy Webber, Rodney Balais, David Morris and others.

81 To prevent Steven Ivankovich's control, the confirmed Plan appointed three independent directors and a disbursing agent. The debtors independent board of directors are Mark Brown, Dr. Olga Ivankovich, and Nancy Webber. The disbursing agent was Stuart Neiberg, a partner in CR. Steven Ivankovich prevented Stuart Nieberg from performing his Plan obligations and he attempted to resign as disbursing agent. Mark Brown, Dr. Olga Ivankovich and Nancy Webber continue as the board of directors of the post confirmation debtors. Dr. Olga Ivankovich and Nancy Webber always defer to Steven Ivankovich direction and allow him to fund his lifestyle through a series of distributions using accounts owned by Dr. Anthony Ivankovich. Dr. Olga Ivankovich and Nancy Webber refuse to abide by their fiduciary duties to the debtors and debtors' creditors, creditors of other LLCs, creditors of Steven Ivankovich, creditors of Plaintiff, and other local counsel, retained and unpaid.

82 Estimated equity in the Texas properties is $33,900,000, after accounting for payment of the secured $5,000,00 loan. Owners of the P-5 Portfolio properties agreed as part of the secured loan of cash collateral, to guarantee the funding of the claims against the estate of Debtor A&O Family (FL). Plaintiff represented the P-5 plan guarantors.

83 The P-5 entities including the three Texas properties agreed that Plaintiff was due and owed his lawfully earned legal fees that in July 2025, exceeded $1,200,000. They

contracted to secure the owed lawfully earned legal fees by executing deeds of trust and a promissory note securing the lawfully earned legal fees due Plaintiff. The original date of Agreement was July 2025. When the transaction was not consummated, the parties confirmed that deeds of trust and a promissory note securing Plaintiff's lawfully earned legal fees would be completed and recorded in November 2025 and the promissory note would be satisfied January 2026 through a sale or refinancing of the properties or other liquidity event including any Tyler Atlas recovery.

84 Steven Ivankovich agreed that Plaintiff's accrued and lawfully earned legal fees were due Plaintiff, as additionally agreed and authorized by CRO Mark Brown, to execute the deeds of trust and promissory note securing past due and lawfully earned Plaintiff's fees.

85 Although Mark Brown had the authority to execute the security documents to avoid any doubt that both he and Steven Ivankovich agreed that Plaintiff's past due and lawfully earned legal fees were a minimum $1,200,000, Steven Ivankovich himself, in writing, provided his consent and agreement to same.

86 The pledge of security to secure Plaintiff's earned and lawfully owed legal fees was a fraudulent representation by Steven Ivankovich known by to be false when made to induce Plaintiff not to withdraw as General Counsel and as counsel in all matters. Plaintiff relied upon Steven Ivankovich's representations and did not withdraw. The security documents were not signed, and the accrued fees were not paid. The P-5 properties still have not been sold or refinanced. Steven Ivankovich has prevented the sale or refinancing. The $5,000,000 loan made by the debtor A&O Family LLC remains past due and unpaid. The promissory note (a negotiable instrument) is now under Steven Ivankovich's control.

87 This pattern of intentional false statements is an action repeatedly engaged in by Steven Ivankovich to fraudulently obtain legal services from Plaintiff and other law firms, to intentionally not pay for lawfully due and earned legal services.

88 Plaintiff represented the P-5 entities and was tasked with preparation of loan documents, coordinating and conducting closing, securing releases of judgements and liens, and issues related to post-closing matters with the title company.

89 Plaintiff was lead counsel in the Walker & Dunlop escrow litigation and represented intervenor P-5 LLCs in what is known as the Special Master Litigation. Plaintiff was in regular contact with the Texas taxing authorities to prevent a tax sale of the P-5 properties, in continuous communication with lien creditors and attorneys representing judgment creditors who had levied on the Texas properties and were attempting to force a judgment creditor sale of the Texas apartments.

**P-2 Portfolio**

90 Debtor Atlas P2 was the indirect owner, through wholly owned limited liability companies of two special purpose entities known as: (1) Atlas Alexandria & Parc Vue LLC that was the owner of an apartment complex located at 10649 Bastille Lane, Orlando, Florida ("Parc Vue"); and (2) Atlas Crowntree Lakes LLC that was the owner of an apartment complex located at 5759 Crowntree Lane, Orlando, Florida ("Crowntree"). Crowntree and Parc View are referred to as P-2 Portfolio. On December 28, 2021, the aforementioned special purpose entities closed on the sale of Parc Vue and Crowntree to unrelated third parties - APV Property Owner LLC and CTL Property Owner LLC.

91 After the sale of the P-2 Portfolio, a creditor holding a personal money judgment against Steven Ivankovich issued a citation to discover assets to Stifel Financial Corporation. In response, due to Steven Ivankovich's managerial capacity on the account holders, Stifel disclosed information and froze the accounts of debtor Ivankovich Family and Atlas P2's wholly owned subsidiary, P2 Portfolio Managing Member, LLC. The funds at the time of the freeze were $30,000,000.

92 The Hon. Judge Sharron Johnson Coleman, United States District Court for the Northern District of Illinois, removed the freeze on Stifel accounts, as the judgment creditor could not establish that these were assets of Steven Ivankovich. Plaintiff was lead counsel.

93 Plaintiff had entered his appearance for the intervening LLCs pro hac vice in the United States District Court for the Northen District of IL.

94 The only remaining sale funds from the P-2 sale on the petition date were $4,245,574 (net of margin loans) invested in P2's wholly owned subsidiary, P2 Portfolio Managing Member, LLC at Celadon. This account was subject to the preliminary injunction entered by the Cook County divorce court, based upon a finding that the assets through the LLC was Steven Ivankovich's alter ego. The assets were committed to fund the Plan, and specifically any claims allowed solely against Debtors A&O Family, LLC (IL), Atlas P2 Managing Member, LLC, and Ivankovich Family, LLC. Plaintiff was counsel representing P-2 and Portfolio and worked with DIP counsel to draft and structure this aspect of the confirmed chapter 11 Plan.

95 Continuing his pattern of criminal activity, Steven Ivankovich pledged the P2 Portfolio Managing Member LLC assets and used those proceeds to buy personal assets and support his lavish lifestyle. He did this intentionally to remove those assets from the other

members of P-2, his personal creditors, Plaintiff, and other law firms not paid, or authorized other "Atlas" or Pilgrim LLCs to pay outstanding due and owing fees.

96 As of the Petition date, there were pending litigation claims involving the P-2 Portfolio in California by a minority owner of Debtor Atlas P2, as discussed in Debtors' Omnibus Objection to Claims of Township Entities, Docket No. 134, and Agreed Motion to Lift the Automatic Stay, Docket No. 198, which is included and incorporated by reference herein. Plaintiff was lead counsel in the California litigation for all defendants other than Dr. Anthony Ivankovich, who was added as a defendant weeks before trial. Plaintiff coordinated, effectuated, and prepared pleadings, For example only - "Nelson Mullins", and otherwise fully participated in retaining counsel for Dr. Anthony Ivankovich. Dr. Anthony Ivankovich signature was forged by Steven Ivankovich in an engagement agreement to pay said firms' fees. As security for the payment of fees, Dr. Anthony Ivankovich, through Steven Ivankovich, agreed to assign defendant Tyler Atlas payments to Nelson Mullins. Steven Ivankovich authorized Plaintiff to confirm the assignment of the Tyler Atlas payments to Nelson Mullins. Consistent with Steven Ivankovich's fraudulent statements, that the Nelson Mullins engagement retainer of $50,000 would be timely paid, to the date of this complaint, no fee payments have been made to Nelson Mullins.

**<u>Investment Accounts and Other Debtor Assets</u>**

97 Debtors had various securities, bonds, and other investments in accounts maintained with Celadon. The balances, net of margin loans, are as follows:

- Ivankovich Family LLC: $2,299,203
- A&O Family, LLC (IL): $904,239
- A&O Family, LLC (FL): $7,533,873.57, and additional investment accounts, with a collective balance of $9,128,060.84, as of September 30, 2024, in readily liquid cash/investment accounts net payment of secured loans, and before disbursement of the $5,000,000 million loan to the P-5 Record Owners.

98. Defendant Yacht Daddy, LLC is 100% owned by A&O Family (FL). Yacht Daddy, LLC owns a 2023 Sunseeker Yacht, which was purchased for approximately $12,000,000 on December 23, 2022, and was subject to no liens or encumbrances. A detailed discussion of the Yacht Daddy purchase is included in the Disclosure Statement of the Periodic Report on Yacht Daddy, LLC filed on September 20, 2024. Docket No. 105.

99. Yacht Daddy, LLC agreed to be a Plan Funder and liquidate the Sunseeker Yacht to the extent necessary to fund any unsatisfied Allowed Claims asserted against Debtors A&O Family, LLC (IL), Atlas P2 Managing Member, LLC, and Ivankovich Family, LLC. Plaintiff represented defendant Yacht Daddy LLC in negotiating its plan participation and drafting the ships mortgage.

100. Consistent with Steven Ivankovich fraudulently using his father, Dr. Anthony Ivankovich's identity, Steven Ivankovich unlawfully assigned Yacht Daddy LLC membership interests to debtor A&O Family LLC (FL).

101. This assignment was merely a "paper title" intended to defraud Steven Ivankovich creditors, including Plaintiff, and all other law firms, with unpaid invoices for earned services rendered to Steven Ivankovich or the LLCs. The actual control and real ownership of the vessel remained in Steven Ivankovich's name. The funds used to

counsel in all matters. Instead, based upon the above listed assurances to pay Plaintiff, Plaintiff provided earned, accrued and lawful legal services to which Defendants have reaped the benefits without paying Plaintiff.

58 Plaintiff, as lead counsel, was tasked with litigating the Township Capital case. As a practical matter, this meant Plaintiff was counsel for all LLCs including P2 and Portfolio 2 Managing Member LLC, which still had $7,000,000 in sale proceeds in an account maintained initially with Celadon and then with RBC. DIP counsel also tasked Plaintiff to participate in arbitration before the Honorable Bankruptcy Judge Paul Hyman (Ret), who agreed to arbitrate the Township Capital claim filed in the chapter 11 cases.

59 Plaintiff was also tasked with litigating the interests of Gary Romaniello, who through an LLC, alleged a 7 % membership interest if the P-5 portfolio. Eventually, in the chapter 11 matter, a settlement was agreed upon between the debtors and P-5 GRA LLC, the alleged owner of a 7% membership in the P-5 portfolio. The settlement was incorporated into the confirmed chapter 11 plan. A copy of the chapter 11 plan, disclosure statement and order confirming the plan will be filed under separate cover.

60 Plaintiff was also tasked with coordinating the debtor and related parties tax returns prepared by Andy Hamm (court appointed CPA), to prepare tax returns for the DIP 's, including K-1's. When DIP counsel was concerned with the deposition testimony of Andy Hamm, DIP counsel requested Plaintiff assist in clarifying the errors made by Andy Hamm in the tax returns.

61 The filing of the debtors' tax returns was critical in order to secure Plan confirmation. No tax returns had been filed by any P-2 or P-5 entity since 2019. The gross sales price of $420,000,000 was not disclosed on any tax return, nor was any pass thru tax liability

the Sunseeker. Either as the victim of elder abuse or knowingly aiding and abetting Steven Ivankovich's fraud, defendant Dr. Olga Ivankovich has not prevented Steven Ivankovich's control of the Yacht.

105. Steven Ivankovich directed "Oli" Hand, the "manager" of Yacht Daddy to sign a listing for the Sunseeker. However, Steven Ivankovich insisted that the listing price be not less than $15,000,000, at least $3,000,000 greater than a bone-fide market based sales price. Steven Ivankovich again had no legal authority to be involved in the sale of the Sunseeker. The Sunseeker was not sold, and the expenses to maintain the yacht are still being paid through Dr. Anthony Ivankovich's RBC account.

106. Plaintiff was tasked with preparing a $5,000,000 ships mortgage securing P-5 GRA LLC's allowed claim secured by the Sunseeker yacht in compliance with the confirmed chapter 11 plan.

107. Although Dr. Olga Ivankovich wanted the Sunseeker sold, to stop the expenses being incurred, and to comply with the sale requirements of the confirmed plan, Steven Ivankovich dominated Dr. Olga Ivankovich and prevented the sale of the Sunseeker.

108. Plaintiff represented the chapter 11 debtors distinguished from counsel for the debtors in possession referred to herein as DIP counsel, and the reorganized (post confirmation) debtors, through the board of directors consisting of Mark Brown CEO, Nancy Webber, Dr. Olga Ivankovich, and Stuart Neiberg CPA, partner in CR, the Plan disbursing agent.

109. Although Steven Ivankovich had no membership interest in any debtor and was not a member of the post confirmation Board of the reorganized debtors, he exercised 100% control over the reorganized debtors and the Board. Steven Ivankovich and Dr. Olga

Ivankovich testified in the chapter 11 confirmation hearing that Steven Ivankovich was not a manager and would not be a manager. Their testimony was perjurious.

110. Defendant Nancy Webber, member of the post chapter 11 Board of directors, was a puppet of Steven Ivankvvich. She was paid with funds misappropriated from Dr. Anthony Ivankovich's RBC account fraudulently accessed by Steven Ivankovich. She knowingly, willfully, and maliciously allowed Steven Ivanovich to use his parents' assets, inter alia, when one of defendant Nancy Webber's job descriptions was as a caretaker for Dr. Anthony Ivankovich during his final years of declining health. Nancy Webber and Dr. Olga Ivankovich permitted Steven Ivankovich to strip Dr. Anthony Ivankovich's assets while he was incapacitated.

111. The real party, Steven Ivankovich, instituted the abusive Tyler Atlas cases. He coerced Nancy Webber to file false statements under oath in a court proceeding as the puppet master; and Dr. Olga Ivankovich either through elder abuse or as a complicit aider and abettor of Steven Ivankovich's fraud defamed Plaintiff and represented that they had an interest in Tyler Atlas LLC. Those representations were false. The false litigation was extortion to: (a) force Plaintiff to wire settlement funds to a secret bank account controlled by Steven Ivankovich; or (b) compel Plaintiff to authorize Tyler Atlas to wire the settlement proceeds to Dr. Anthony Ivankovich's RBC account so that Steven Ivankovich impersonating his father would withdraw the money, refuse to pay Plaintiff his accrued, due and owing, lawfully earned legal fees, and use the money to pay for his lavish lifestyle, In essence, stealing from Plaintiff.

112. Steven Ivankovich, Dr. Olga Ivankovich, and Nancy Webber were not managers or members of Tyler Atlas LLC. They/each were directed to represent as managers and

members of Tyler Atlas by defendant Lynch, who in conjunction with his real client Steven Ivankovich, invented the Tyler Atlas LLC allegations to extort Plaintiff.[10]

113. It was Steven Ivankovich's control, fraud, and continued unauthorized accessing debtor and Dr. Anthony Ivankovich's accounts, especially in December 2025, that prevented Plaintiff from continuing to represent the LLC's and withdraw as counsel.

114. Steven Ivankovich engaged in other conduct that required Plaintiff to withdraw.

**Disputes Relating to Repayments of Certain Debts:**

115. A substantial amount of the legal services provided by Plaintiff was to preserve the LLC assets and protect those assets from creditors of Steven Ivankovich. To protect those assets from being "taken" by Steven Ivankovich, to the detriment of the LLC's and his parents Drs. Olga and Anthony Ivankovich, every court that considered Steven Ivankovich's access to and use of LLC assets, including bank accounts, concluded that either the LLCs were Steven Ivankovich's alter ego, or that the assets were actually Steven Ivankovich's and not the assets of the particular LLC.

116. The conclusion of CR, as set forth in the tracing reports, is that Steven Ivankovich invested no funds in any LLC, and that he purposefully, with forethought and intent, transferred to himself or other LLCs that he actually owned, a minimum of the $89,000,000 in net sales proceeds from the sale of the four Florida properties. No sales proceeds were repaid to A&O Family LLC (FL). To mislead all interested parties

[10] Plaintiff has email confirmation of Steven Ivankovich and Defendant Lynch conspiring to sue Plaintiff. The email will be filed under seal when an appropriate order is entered. To further extort Plaintiff, Defendant Lynch accused Plaintiff of obtaining money under false pretenses and threatened criminal action against Plaintiff, unless Plaintiff gave up any claim to his fee claims. Defendant Lynch actually made a false police report against Plaintiff. Plaintiff intends to prove that threatening an adversary by filing a criminal complaint is a tactic continually resorted to by Steven Ivankovich, his counsel, and a pattern of Atlas Group's criminal conduct.

including Plaintiff, Steven Ivankovich created a second LLC having the same name as A&O Family LLC (FL) the LLC whose membership was owned 100% by Drs Ivankovich. The 'new" LLC was named A&O Family LLC and organized under the laws of Illinois. Steven Ivankovich owned 100% of the membership interests in A&O Family LLC (IL).

117. Steven Ivankovich also formed an entity named Ivankovich Family LLC, an entity that he owned a 100% membership interest, and he diverted sales proceeds to Ivankovich Family LLC, an entity that filed for chapter 11 relief.

118. Based on Steven Ivankovich's lifestyle required enormous cash flow, it's estimated that his monthly obligations exceeded $500,000. Once the chapter 11 petitions were filed, the debtor investment accounts were "frozen", and Steven Ivankovich could not access the investment funds in those accounts to support his lifestyle.

119. Pursuant to the affidavit of Joseph Seintz, Steven Ivankovich's former head of security, Steven Ivankovich began impersonating Dr. Anthony Ivankovich to RBC in order to effectuate the withdrawal of funds from Dr. Anthony Ivankovich's investment and pension accounts. Steven Ivankovich, without any voluntary, knowing, or intelligent consent by Dr. Olga Ivankovich, or her knowing consent as an aider and abettor, borrowed funds from Celadon and/or RBC debtor accounts on margin and used the proceeds to buy assets that were held in LLC names, but who's real "ownership" was Steven Ivankovich. A copy of Joeseph Seinitz affidavit is attached to the Response

of Jeanette Ivankovich to the motion to vacate the appointment of a receiver by the divorce court.[11]

120. Steven Ivankovich used sycophants to disguise that he was the "puppet master." Those sycophant's included Nancy Webber, David Morris, Rodney Bailas, Dr. Olga Ivankovich and others. Steven Ivankovich directed them to withdraw funds, hold membership interests in their names, pay Steven Ivankovich's monthly bills from money misappropriated from his own father, Dr. Anthony Ivankovich's account(s), pay his credit card bills that averaged $100,000 per month, all of which were all in the name of Dr. Anthony Ivankovich.

121. Plan confirmation required that Steven Ivankovich confirm that post confirmation he would not mange any debtor or plan guarantor, specifically Yacht Daddy LLC and the P-5 Texas LLCs. Dr Olga Ivankovich testified that Steven Ivankovich would have no management or officer role post confirmation. Mark Brown would confirm same as the asset manager and person with the sole right to operate, manage, refinance, day to day oversee operations, and sell the Texas properties.

122. The forgoing representations were either not true when made, or that Dr. Olga Ivankovich believed the representations were true when made but subsequently ceded all control to Steven Ivankovich. Steven Ivankovich exercised his control to have "Galaxy", the PE lender on the P-2 property that was sold, transfer in excess of $1,000,000 that Galaxy was holding in escrow as an undisclosed debtor asset. The transfer was arranged by Steven Ivankovich post confirmation and diverted from a

[11] An exhibit registrar and Exhibits will be docketed separately and may be docketed under seal once an appropriate court order is entered.

debtor asset to be used by Steven Ivankovich to support his lavish lifestyle. The funds and asset of P-2, or the non-debtor Portfolio 2 Managing Member LLC, should have been available to pay claims, or pay the outstanding fees. The escrow was known to exist when the bankruptcy schedules were filed and intentionally not disclosed.

123. Plaintiff, Mark Brown, and David Rosendorf (chapter 11 counsel for Drs. Ivankovich) met with Dr. Olga Ivankovich to educate her on the many business interests, and companies being operated by Steven Ivankovich, the assets of those companies and her knowledge of the existence of the companies, their assets, and the source of the funds used to acquire and maintain those assets.

124. Although Dr. Olga Ivankovich tried to take control back from Steven Ivankovich, he eventually dominated his mother, and he made all decisions, including continuing to access his parents' personal investment accounts.

125. Steven Ivankovich's control caused the false abusive Tyler Atlas litigation to be filed. This was his retribution for Plaintiff's refusal to wire the Tyler Atlas settlement proceeds to his secret bank account.

126. Steven Ivankovich has a pattern of using frivolous litigation and reporting "crimes" to extort funds or to compel people to take action that he directs. These matters include having his wife Jeanette arrested; filing a false criminal complaint concerning alleging stolen marine equipment and demanding that Joe Seintz file a criminal complaint arising from the alleged "stealing" of charter payments for chartering the yacht known as "Octopussy". This pattern included Steven Ivankovich forging his former attorney's name to a lease, forging his former security person's name to an affidavit, conspiring to have himself and Jeanette sued in a phony eviction case. It includes a malicious

allegation that his former designer stole marine equipment, an allegation that may have led to her suicide. Even this did not stop Steven Ivankovich, he filed false claims in her estate. Steven coerced Joe Seintz to commit perjury by testifying falsely in the Cook County divorce case.

127. Every Court that heard issues arising from Steven Ivankovic's puppet master control concluded that Steven Ivankovich has no credibility, was a liar, and perjurer.

128. When Plaintiff discovered the extent of Steven Ivankovich's actions, and the adverse effect it had on his obligation to preserve LLC assets, he withdrew as counsel.

129. Plaintiff represented Vandelay, an entity formed to make secured loans. One of the loans that Vandelay made in the approximate amount of $5,000,00 was through negotiations to be satisfied by the borrower in November 2024.

130. Vandelay agreed that it would repay Plaintiff his accrued and unpaid legal fees from the loan payoff receipt. It was estimated that the accrued unpaid fees by the payoff date were $512,000 plus legal fees earned, due and unpaid to Jason Wandner, Esquire.

131. Plaintiff sent Vandelay an invoice for payment, and Vandelay, through its manager Mark Brown, agreed to pay the invoice.

132. Vandelay received the loan payoff of more than $5,000,000. Notwithstanding its agreement to pay Plaintiff's earned, due, and accrued legal fees as invoiced, Vandelay wired most, if not all the mortgage payoff funds to Dr. Anthony Ivankovich's RBC

wealth account. Steven Ivankovich accessed his father's RBC account and withdrew all the loan payoff funds.

133. The legal fees due and owing Plaintiff that Vandelay agreed to pay Plaintiff have never been paid.

134. The legal fees due and owing Plaintiff that was agreed to be paid by the P-5 LLCs and Overlook have never been paid.

135. Tyler Atlas agreed to pay the legal fees due and owing Plaintiff from a liquidity event that was the final payment of the judgement against Big Outdoor Signs and Michael Goldstein as ordered by the Judge in said case. Although Tyler Atlas wired the funds to Plaintiff, when the false claims were made against Plaintiff, in good-faith, Plaintiff agreed to place the now disputed funds in escrow. Notwithstanding same, to date, Tyler Atlas has not paid the lawfully earned legal fees due Plaintiff.

## COUNT 1 - Breach of Contract

**Plaintiff sues the following Defendants: Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, ("Pilgrim" or "P-5"); Overlook Managing Member LLC ("Overlook"): Portfolio 2 Managing Member LLC ("P-2"); Tyler Atlas LLC; Atlas Holdings Investment LLC; Consilient Holding Investments LLC ("Consilient"); Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC, the owner of a condominium located at 401**

**North Wabash unit 55 A Chicago IL, known as the "Trump Condominium"; Vandelay Mortgage Fund 1 LLC (Vandelay) and Dr. Olga Ivankovich**

136. The allegations contained in complaint ¶ 1-135 are incorporated herein as if more particularly set forth.

137. Each of the defendants entered into an agreement to pay Plaintiff for the legal services he rendered to each defendant and to the group of defendants known as the "Atlas Group" of Atlas Family Office. Defendants Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLCLLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC ("Pilgrim" or "P-5"); Overlook Managing Member LLC ("Overlook) were parties to the original engagement agreement and subsequent agreements to pay for the earned, past due and accrued legal fees due Plaintiff. Said defendants through their Manager agreed to secure Plaintiff's legal fees by executing deeds of trusts (mortgages) on each of the three Texas apartment projects, execute a promissory note, and satisfy the lawfully owned legal fees due on the date of payment, $1,960,000, by a sale or refinancing of the Texas properties not later than January 31, 2026.

138. The P-5 LLCs agreed to pay Plaintiff's legal fee by assignment to Plaintiff the certain Walker & Dunlop proceeds deposited in the registry of the United States District Court for the Northern District of Illinois.

139. Tyler Atlas LLC was a signatory to the original engagement agreement. It also agreed to pay bills specifically for the legal services provided by Plaintiff to local counsel in the matter known as the Michael Goldstein litigation. Tyler Atlas agreed to pay Plaintiff earned, due and owing legal fees from any recovery concerning the Michael Goldstein litigation that involved three separate matters. Tyler Atlas recovered in excess

of $100,000 in the first matter, a foreclosure case involving property located in Palm Beach County, Florida. Tyler Atlas recovered approximately $5,000,000 in the second litigation, a foreclosure case in Cook County, Il. Tyler Atlas breached its agreement to pay Plaintiff. Plaintiff received none of his due and owing legal fees from these first two recoveries. The third matter is a complicated multi-year litigation to recover and foreclose on a loan secured by an easement on an outdoor sign. Tyler Atlas had a gross recovery of approximately $2,000,000. Although it agreed to pay Plaintiff's lawfully earned, due, and accrued legal fees from the final liquidity event, to wit, the collection of approximately $1,400,000 on a $1,400,000 judgement. Tyler Atlas wired $1,200,000 to Plaintiff, then made a false and fraudulent claim against Plaintiff, at the direction of the defendants Steven Ivankovich and David Lynch. Plaintiff agreed to place the now disputed fee payment in escrow. Defendant Tyler Atlas breached its agreement to pay Plaintiffs his earned, legitimate, and accrued legal fees.

140. Defendants Atlas Holdings Investment LLC; Consilient; Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC;(the owner of a condominium located at 401 North Wabash unit 55 A Chicago IL. Known as the "Trump Condominium"). Vandelay Mortgage Fund 1 LLC (Vandelay) were not parties to the engagement agreement. Said defendants were part of the LLC's and entities that acquired assets during the period that the Plaintiff was General Counsel for the "Atlas Group." Each of said defendants

through their manager or representative agreed to pay individually and collectively all of Plaintiff's accrued and past due fees.

141. The defendant Dr. Olga Ivankovich was not a party to the engagement agreement. In May 2025, the Plaintiff informed defendant Olga Ivankovich that he was owed past due legal fees of exceeding $1,000,000, and that fees were accruing . The Plaintiff informed defendant Olga Ivankovich that he would withdraw as General Counsel if his past due fees were not paid and if a minimum retainer in the amount of $25,000 was not made every month. Defendant Dr. Olga Ivankovich agreed to pay the past due legal fees and agreed to pay the accruing legal fees.

142. Each of the defendants breached their agreements to pay jointly and severally the Plaintiff's legal fees.

143. Plaintiff has been required to engage counsel to pursue his legal remedies.

Wherefore, Plaintiff requests a judgment against each defendant in the amount of $1,960,000 plus pre and post judgment interest , costs, and the reasonable reimbursement of Plaintiff's legal fees; and such other and further relief as the nature of Plaintiff's cause of action may entitle the Plaintiff to.

## Count 2 - Unjust Enrichment

**Plaintiffs sues the following Defendants: Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to collectively as ("Pilgrim" or "P-5"); Overlook Managing Member LLC; ("Overlook); Portfolio2 Managing Member LLC ("P-2"); Tyler Atlas LLC; Atlas Holdings Investment LLC; Consilient Holding Investments LLC; ("Consilient"); Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC, the owner of a condominium located at 401 North Wabash unit 55 A Chicago IL,**

**known as the "Trump Condominium"; Vandelay Mortgage Fund 1 LLC (Vandelay), and Dr. Olga Ivankovich**

144. The allegations contained in complaint ¶ 1-143 are incorporated herein as if more particularly set forth.

145. Plaintiff provided legal services to each of the above named defendants.

146. Defendant LLCs had actual knowledge of the legal services that Plaintiff was performing for each of them individually, and as a group .

147. Through their managers and authorized representatives, each of the defendants had benefited from Plaintiff's legal services, including his representation to protect their assets from Steven Ivankovich's creditors, and from the claims made by Jeanette

Ivankovich that the LLCs and LLC assets were "marital property" of Steven Ivankovich and Jeanette Ivankovich.

148. Defendant Dr. Olga Ivankovich had actual knowledge that Plaintiff was providing the legal services enumerated herein and voluntarily accepted and retained the benefit of all said legal services.

149. Defendant LLCs voluntarily accepted and retained the benefit of all Plaintiff's legal services. Defendant LLCs had actual knowledge Plaintiff was spending 40-50 hours per week providing said legal services.

150. Defendant LLCs voluntarily accepted the benefits of and retained the benefits of Plaintiff's conferred legal services.

151. Defendants had actual knowledge that Plaintiff was accruing his lawfully earned legal fees and withholding collection of the legal fees until such time as Defendants had a liquidity event.

152. Defendants had actual knowledge that Plaintiff was providing legal services pursuant to Mark Brown's authority as set forth in his CRO agreement and resolutions of the P-5 LLCs.

153. The circumstances of Plaintiff performing all the legal services described herein, while not even receiving the minimum earned Plaintiff's legal fees, all defendants knowingly accepting Plaintiff's legal services, the success of those services, and the agreement to pay for those services render it inequitable for defendants to retain the benefit of the legal services without paying Plaintiff the agreed earned value of same.

154. It is unfair that defendants, for five years, knowingly requested and accepted the full time legal services provided by Plaintiff, that the defendants now defer to the

fraudster Steven Ivankovich a non – manager and non -member in refusing to pay Plaintiff for the legal services rendered.

Wherefore, Plaintiff requests a judgment, jointly and severally, against each defendant in the amount of $1,960,000 plus pre and post judgment interest, costs, the reasonable reimbursement of Plaintiff's legal fees; and such other and further relief as the nature of Plaintiff's cause of action may entitle Plaintiff.

**Count 3 - Quantum Meruit**

**Plaintiffs sues the following Defendants: Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to collectively as ("Pilgrim" or "P-5"); Overlook Managing Member LLC ("Overlook"); Portfolio 2Managing Member LLC ("P-2"); Tyler Atlas Holdings Investment LLC; Consilient Holding Investments LLC; ("Consilient"); Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC, the owner of a condominium located at 401 North Wabash unit 55 A Chicago Known as the "Trump Condominium"; Vandelay Mortgage Fund 1 LLC (Vandelay) and Dr. Olga Ivankovich**

155. The allegations contained in complaint ¶ 1-154 are incorporated herein as if more particularly set forth.

156. Plaintiff performed all the legal services described herein.

157. Plaintiff also provided legal services to other "Atlas Group" entities not included as defendants. Those matters included but are not limited to: A) representation in the matter of Aquaform boats, an $8,000,000 investment in a failed/ inflatable boat manufacturing marketing scheme; B) KGI Marine, a failed boat manufacturing and marketing business in Dubai; and C) boat chartering business that involved the purchase of boats in Dubai importing the boats to the United States, then attempting to title the

counsel in all matters. Instead, based upon the above listed assurances to pay Plaintiff, Plaintiff provided earned, accrued and lawful legal services to which Defendants have reaped the benefits without paying Plaintiff.

58 Plaintiff, as lead counsel, was tasked with litigating the Township Capital case. As a practical matter, this meant Plaintiff was counsel for all LLCs including P2 and Portfolio 2 Managing Member LLC, which still had $7,000,000 in sale proceeds in an account maintained initially with Celadon and then with RBC. DIP counsel also tasked Plaintiff to participate in arbitration before the Honorable Bankruptcy Judge Paul Hyman (Ret), who agreed to arbitrate the Township Capital claim filed in the chapter 11 cases.

59 Plaintiff was also tasked with litigating the interests of Gary Romaniello, who through an LLC, alleged a 7 % membership interest if the P-5 portfolio. Eventually, in the chapter 11 matter, a settlement was agreed upon between the debtors and P-5 GRA LLC, the alleged owner of a 7% membership in the P-5 portfolio. The settlement was incorporated into the confirmed chapter 11 plan. A copy of the chapter 11 plan, disclosure statement and order confirming the plan will be filed under separate cover.

60 Plaintiff was also tasked with coordinating the debtor and related parties tax returns prepared by Andy Hamm (court appointed CPA), to prepare tax returns for the DIP 's, including K-1's. When DIP counsel was concerned with the deposition testimony of Andy Hamm, DIP counsel requested Plaintiff assist in clarifying the errors made by Andy Hamm in the tax returns.

61 The filing of the debtors' tax returns was critical in order to secure Plan confirmation. No tax returns had been filed by any P-2 or P-5 entity since 2019. The gross sales price of $420,000,000 was not disclosed on any tax return, nor was any pass thru tax liability

**Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to as collectively as ("Pilgrim" or "P-5"); and Overlook Managing Member LLC ("Overlook")**

164. The allegations contained in complaint ¶ 1-163 are incorporated herein as if more particularly set forth.

165. The defendants entered into a contract with Plaintiff to execute and record deeds of trusts, (mortgages) on the real property (apartment complexes) known as Pilgrim Owner LLC; Pilgrim Coulter Owner LLC; and Pilgrim Windtree Owner LLC.

166. The defendants entered into a contract with Plaintiff to execute a promissory note in an amount of $1,200,000 plus accrued legal fees through the date of payment secured

by deeds of trust on the real property (apartment complexes) known as Pilgrim Owner LLC; Pilgrim Coulter Owner LLC; and Pilgrim Windtree Owner LLC.

167. The deeds of trust and promissory note were intended to secure the legal fees that were earned, due and payable to Plaintiff, and the legal fees that would accrue through the date of satisfaction of the promissory note.

168. The defendants agreed to sell the apartment complexes owned by Pilgrim Owner LLC; Pilgrim Coulter Owner LLC; and Pilgrim Windtree Owner LLC, by January 2026, or "refinance " said properties by that date.

169. The defendants agreed that the promissory note due to be paid Plaintiff from the sale of loan proceeds would be paid by January 31, 2026.

170. Plaintiff relied upon the written representation of all defendants to his detriment.

171. Plaintiff prepared the deeds of trust and promissory note and sent the documents to defendants to be executed and then recorded in the land records in which each of the properties is located.

172. The real property owned by the defendants is unique.

173. The defendants had / have no other adequate security to provide Plaintiff to secure the legal fees now exceeding $1,960,000.

174. The defendants have refused or negligently failed to execute the deeds of trust and promissory note to secure the earned, accrued and accruing legal fees due Plaintiff.

175. Intervening creditors of the defendants or Steven Ivankovich, now have the opportunity to secure a priority lien on the real property owned by the defendants ahead of Plaintiff's secured claim.

176. The debtor A&O Family has a first mortgage on the P-5 properties in the amount of $5,000,000. The defendants, through Steven Ivankovich, the actual person in control may use this mortgage as a vehicle to foreclose on the real property, thereby "stripping out" or reducing the equity in the real property to the detriment of Plaintiff and other creditors of the defendants.

177. The defendants have refused to sell or even list the real properties for sale.

178. Steven Ivankovich is not a manager or officer of the P-5 properties.

179. The sole manager of the P-5 properties is Mark Brown.

180. Mr. Brown as manager of the P-5 entities agrees Plaintiff is due his earned legal fees billed, a minimum of $1,960,000, and agrees that the properties must be refinanced or sold, and from the sale proceeds that Plaintiff's legal fees be paid. Mr. Brown also

agrees that the sale proceeds should be used to pay other obligations including all fees due Mr. Brown under his various agreements, and all chapter 11 Plan obligations.

181. Steven Ivankovich has prevented Mr. Brown from fulfilling his legal obligation.

182. Plaintiff has no remedy at law to compel the P-5 defendants to execute the deeds of trust and promissory note secured by the real property owned by the three Texas LLCs that are owners of the apartments.

183. Plaintiff has no remedy at law to require the defendant LLCs to sell the real properties, satisfy the first mortgage (that is required to be paid by the extension date, December 31, 2026).

184. Plaintiff has no remedy at law to require the sale of the real property and the satisfaction and payment of his accrued and currently due legal fees.

185. To convey good and marketable title to the real properties owned by Pilgrim Windtree Owner LLC, Pilgrim Coulter Owner LLC, and Pilgrim Warwick Owner LLC a "comport order" is requested to be included in the order granting specific performance. The order would a) confirm Mark Brown's authority to sell or if applicable refinance said properties; b) retain this Court's jurisdiction to approve the terms and conditions of any sale or refinancing; c ) retain the court's jurisdiction to pre-approve the disbursement of sale or refinancing proceeds such other terms as this court may determine to be applicable; and d) Order the sale or refinancing of the P-5 properties.

Wherefore it is prayed that the Court enter an order as follows:

A. Order Defendants Pilgrim Windtree Owner LLC; Pilgrim Coulter Owner LLC and Pilgrim Warwick Owner LLC, through their Manager Mark Brown, to

execute the three deeds of trust securing the legal fees due Plaintiff in the amount of $1,960,000 plus accruing legal fees and interest.

B. Order Defendants Pilgrim Windtree Owner LLC; Pilgrim Coulter Owner LLC and Pilgrim Warwick Owner LLC, through their Manager Mark Brown, to execute the promissory note prepared by Plaintiff in November 2025 in the amount of $1,960,000 plus accruing interest though the date of payment.

C. Order Pilgrim Windtree Owner LLC; Pilgrim Coulter Owner LLC and Pilgrim Warwick Owner LLC, through their Manager Mark Brown, to list the apartments for sale; accept a contract of sale and close on the sale of the properties within a reasonable period of time as directed by this court.

D. In the event defendants refuse to execute the security loan documents that the court appoint a Trustee or Receiver to execute the security loan documents.

E. In the event defendants fail to list the real properties for sale within 10 days of an order being entered, the court appoint a Trustee or Receiver to list the real properties for sale and supervise the sale and closing of said properties.

F. That this court assume jurisdiction of all matters relating to the listing, sale, disbursements, and closing of the real properties.

G. That in the interim, the court enter a constructive trust, to maintain the status quo on said properties.

H. Such other and further relief as equity requires.

## Count 5 - Abuse of Process

**Plaintiffs sue the following Defendants: Tyler Atlas LLC; Steven Ivankovich, Nancy Webber, and Dr. Olga Ivankovich**

186. The allegations contained in complaint ¶ 1-185 are incorporated herein as if more particularly set forth.

187. Defendant Tyler Atlas LLC, through defendants Steven Ivankovich, Nancy Webber and Dr. Olga Ivankovich filed three civil complaints against Plaintiff.

188. The complaint allegations were not true and known to be untrue when the complaints were filed.

189. The first complaint was filed in the Circuit Court for Baltimore City, Maryland. It alleged that Plaintiff "fraudulently" obtained funds of Tyler Atlas LLC. The complaint was signed under oath by the defendant Nancy Webber. It was falsely supported by affidavits signed by defendants Dr. Olga Ivankovich, and Steven Ivankovich.

190. Defendant Webber signed a perjurious affidavit. When defendant Webber stated under oath that she was the Manager of Tyler Atlas LLC, that statement was not true, and Webber specifically knew the statement was not true.

191. Defendants Dr. Olga Ivankovich and Steven Ivankovich's affidavits were false and perjurious.

192. The complaint's immediate purpose and the use of process in support of the complaint were not used for the purpose intended, namely, to have a court determine a bone-fide dispute. The complaint was filed to extort and blackmail Plaintiff into diverting Tyler Atlas settlement funds to Steven Ivankovich individually.

193. Steven Ivankovich was not a manager or member of Tyler Atlas LLC. He had resigned as one of two managers of Tyler Cambridge LLC, the manager of Tyler Atlas LLC. He had no legal or equitable right to receive settlement proceeds, had previously arranged for Tyler Atlas LLC to wire more than $5,000,000 of a prior loan recovery to the RBC account of Dr. Anthony Ivankovich, and then withdrew the proceeds from said account without any authority.

194. When Plaintiff refused to aid and abet Steven Ivankovich's new fraud, Steven Ivankovich used the express threat to file, and then actually file the false Tyler Atlas LLC complaint to defame Plaintiff and extort Plaintiff to compel Plaintiff to wire Steven Ivankovich the Tyler Atlas funds.

195. Defendant Webber had actual knowledge that the complaint she signed under oath was false. She informed Plaintiff that she was not a Manager of Member of Tyler Atlas LLC.

196. Defendant Olga Ivankovich had actual knowledge the complaint allegations were false.

197. Defendants purposefully and knowingly conspired and colluded to create a back dated document purporting to appoint Nancy Webber as Manager of Tyler Atlas in March 2025. This document was a fraud on the court. Steven Ivankovich confirmed with Plaintiff in September 2025, that he was a manager of Tyler Atlas, and that he wanted to resign and appoint either defendant Nancy Webber or defendant Olga Ivankovich as a manager. Plaintiff, in January 2026, confirmed with Ms. Webber that she was not a manager of Tyler Atlas LLC.

198. Defendants Olga Ivankovich, Steven Ivankovich, and Nancy Webber made illegal, improper, and perverted use of the process, each individually and collectively had ulterior motives and purposes in exercising such illegal, improper, and perverted process. These illegal and perverted purposes were specifically and knowingly intended to avoid Tyler Atlas LLC and the Atlas Group from paying the legal fees lawfully due to be paid Plaintiff. The illegal purpose included the cover up of Steven Ivankovich withdrawing millions of dollars from Dr. Anthony Ivankovich's RBC accounts; he covers up of the elder abuse of Olga Ivankovich or her collusion with her son Steven Ivankovich to wipe out her husband's assets.

199. By extorting Plaintiff, all defendants intended and purposeful illegality was to try to make Plaintiff complicit in their criminal conduct. When Gary refused, the illegal process was filed.

200. The second illegal process was the filing of Tyler Atlas LLC through the other real party, defendants Steven Ivankovich, Nancy Webber, and Dr. Olga Ivankovich of a complaint in Cook County, Illinois. The complaint is a malpractice complaint alleging Plaintiff committed malpractice by not taking an appeal in the Tyler Atlas litigation. The complaint and process served was an illegal, improper, and perverted use of the process, each individually and collectively had ulterior motives and purposes in exercising such illegal, improper, and perverted process.

201. Each defendant had actual knowledge that Plaintiff was not counsel for Tyler Atlas in the litigation. In reality, Tyler Atlas was represented by Michael Debre, Esquire. Tyler Atlas Manager Will Deeds agreed to accept the judgment payoff. Mr. Deeds executed the release of the loan documents. Tyler Atlas' Manager Will Deeds

and its counsel of record, Michael Debre, made the decision to accept the payment of the judgement and comply with a court order. Tyler Atlas, when it filed the malpractice complaint against Plaintiff had actual knowledge that Plaintiff was not counsel in the case and had no authority to "appeal" for Tyler Atlas.

202. Complaint number 2 was filed against Plaintiff by Defendants Nancy Webber, Olga Ivankovich, and Steven Ivankovich specifically intended by all defendants to extort Plaintiff to give up his earned and due claim of fees in a concerted effort to coerce Plaintiff to aid and abet each of the defendant's fraud.

203. The third abusive complaint was the filing by multiple "claimants" in a certain American arbitration Association ("AAA") case. The real party in interest, Steven Ivankovich, filed the AAA case as manager of multiple entities. Defendants Olga Ivankovich and Nancy Webber had actual knowledge that Steven Ivankovich filed the AAA case by falsely claiming he had the authority to do so. All defendants aided and abetted Steven Inackovich's false fraudulent representations that the claimant entities had a fee dispute with Plaintiff. The AAA case and process was an illegal, improper, and perverted use of the process. Each defendant individually and collectively had ulterior motives and purposes in exercising illegal, improper, and perverted process.

204. The AAA case was scheduled for a 4 day trial.

205. The three above cases initialed by all defendants continued to abuse the process improperly.

206. Plaintiff, as a result and direct proximate cause of defendants' abuse of the process sustained damages.

Wherefore, Plaintiff request that judgement be entered against each of the foregoing defendants in an amount exceeding $1,000,000 plus pre and post judgement interest, costs, reasonable legal fees, and such other and further relief that Plaintiff may be entitled to.

**Count 6 - Malicious Prosecution**

**Plaintiffs sues the following Defendants: Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to collectively as ("Pilgrim" or "P-5"); Overlook Managing Member LLC ("Overlook); Portfolio 2Managing Member LLC ("P-2"); Tyler Atlas Holdings Investment LLC; Consilient Holding Investments LLC ("Consilient"); Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC;(the owner of a condominium located at 401 North Wabash unit 55 A Chicago Known as the "Trump Condominium"). Vandelay**

**Mortgage Fund 1 LLC ("Vandelay") Dr. Olga Ivankovich, Nancy Webber, and Steven Ivankovich**

207. The allegations contained in complaint ¶ 1-206 are incorporated herein as if more particularly set forth.

208. The defendants instituted a bogus and unlawful arbitration case through the AAA in AAA Case No. 01-26-0000-0449.

209. The defendants lacked the authority to file the AAA case.

210. The arbitrator scheduled a four day trial commencing October 5, 2026.

211. As the claimants, including defendants Webber and Olga Ivankovich, had the obligation and option to pay the costs of the arbitration case.

212. Plaintiff was not obligated to pay the costs of the arbitration case.

213. Defendants intentionally, on the eve of trial, and to avoid an AAA trial, unilaterally and of their own accord and power, declined to pay the arbitration fees.

214. As a result of the defendants' actions, the AAA was suspended.

215. Defendants brought the AAA case without probable cause, and without the authority of Mark Brown, the Manager of at least 11 of the AAA claimants.

216. Defendants brought the AAA case for an improper purpose - specifically to delay Plaintiff in pursuing the collection of his legal fees - legal fees that the Manager of most of the AAA claimants admit are earned and due Plaintiff.

217. The defendants knowing they would not prevail in AAA, and knowing they and their counsel had no authority from their clients (Managed by Mark Brown) to request

arbitration, pursued the AAA case until trial was to start. Then, defendants refused to pay the AAA fees, and AAA case was suspended and terminated.

218. Plaintiff has sustained damages as a direct and proximate result of the defendants' actions as alleged herein.

Wherefore, Plaintiffs request that judgement be entered against each of the foregoing defendants in an amount exceeding $1,000,000, plus pre and post judgement interest, costs, reasonable legal fees, and such other and further relief that Plaintiff may be entitled.

**Count 7 - Extortion and Obstruction of Justice**

**Plaintiffs sue the following Defendants: Daniel Lynch, Steven Ivankovich, Dr. Olga Ivankovich, and Nancy Webber**

219. The allegations contained in complaint ¶ 1-218 are incorporated herein as if more particularly set forth.

220. Beginning in January 2026, Defendants undertook an illegal coordinated course of conduct against Plaintiff.

221. Defendant Lynch made a criminal complaint against Plaintiff to law enforcement in Cook County, Illinois.

222. The original protagonists in the blackmail extortion scheme were defendants Lynch and Steven Ivankovich. On or about January 10, 2026, said defendants hatched their plot to threaten extortion and make a criminal complaint against Plaintiff should Plaintiff not wire the settlement funds that he was holding to Steven Ivankovich.

223. On that date, Steven Ivankovich was not a member, manager, or had any ownership interest of Tyler Atlas LLC the entity that received the litigation proceeds. Defendant Lynch had actual knowledge that Steve Ivankopvich had no authority to

direct Plaintiff to wire the settlement funds to Steven Ivankovich's "secret account" in Leads Bank. A simple Google search any reasonable "know your client" search would have disclosed that Steven Ivankocivh had multiple contempt orders entered against him, had been adjudicated by multiple court orders to not be credible, had testified that he had no assets, no LLC interests and was insolvent. A simple search would have disclosed that a Receiver had been appointed by a Judge in Cook County, Illinois, for all LLCs that Steven Ivankovich may have had an interest in, including Tyler Atlas LLC. A simple inquiry would have disclosed that Nancy Webber was not a manager of Tyler Atlas LLC, and any document appointing her as a manager was either back dated, forged, or otherwise not a legal document. A simple search of the corporate records of the Secretary of State for Illinois, would have disclosed to Defendant Lynch that in July 2025 Tyler Atlas LLC represented that its Managers were William Deeds and Steven Ivankovich. Thus, any claim that Nancy Webber was a Manager in March 2025 was false, and an unlawful document.

224. On January 12, 2026, defendant Lynch, after consulting Steven Ivankovich, admitted that calling and threatening Plaintiff may be a "bad idea", called Plaintiff and threatened him with Lynch filing a criminal complaint against Plaintiff.

225. When Plaintiff refused to submit to this extortion, and refused to wire the settlement funds, Lynch made a formal police report alleging Plaintiff acquired Tyler Atlas funds under false pretenses. The report was false in all facts, and defamed Plaintiff as it was intended to do.

226. On or about January 22, 2026, Plaintiff confirmed with Nancy Webber that she was not a manager of Tyler Atlas.

227. The criminal complaint was a false accusation of criminal conduct against Plaintiff.

228. Defendant Lynch and Steven Ivankovich knowingly provided false information to law enforcement that caused and procured the initiation of a criminal investigation against Plaintiff based upon materially false information.

229. Defendants Webber and Dr. Olga Ivankovich joined the conspiracy to defame and extort Plaintiff. Each did so for their own financial benefit. Webber because she was being paid her "salary" by Steven Ivankovich through money he was stealing from his father's RBC wealth account. Defendant Olga Ivankovich because she was "threatened" by her son Steven Ivankovich. She was told by him that "everyone" was after her "money." Dr. Ivankovich either because of Steven's elder abuse or because she wanted to "coverup" Steven Ivankovich's criminal conduct, went along with the plot to wrongfully accuse Plaintiff of a crime.

230. Defendants conspired to and did back date a document that purported to appoint Nancy Webber as a Manager of Tyler Atlas. Steven Ivankovich, as late as November 2025, requested Plaintiff as General Counsel, to document the replacement of Will Deeds as a manager of Tyler Atlas and suggested that he be replaced by Nancy Webber. Steven Ivankovich confirmed in email communications with Plaintiff and Tyler Atlas's counsel, that Steven Ivankocivh was not a Manager of Tyler Atlas. Plaintiff refused to draft the corporate resolutions naming Nancy Webber as manager of Tyler Atlas. Defendants in discovery produced a document back dated to March 2025 appointing Nancy Webber as a Manager of Tyler Atlas. The document is false, back dated, altered, or simply a made up document. This as will be demonstrated by other facts is a pattern of criminality engaged in by defendants.

231. Defendants intentionally concealed the material facts and authenticity of the document. Defendants had actual knowledge that the document was false. The Receiver appointed by the Cook County Judge notified Tyler Atlas that the alleged document was false.

232. Defendants knew that the criminal accusations made against Plaintiff were false or acted with reckless disregard for whether the accusations were true.

233. Defendants possessed information demonstrating that the accusations were false but nevertheless caused the accusations to be communicated to law enforcement.

234. The false allegations were not made as an innocent mistake. Rather, they were part of a deliberate course of illegal conduct intended to cause governmental authorities to investigate, arrest, prosecute, threaten, or otherwise take adverse action against Plaintiff.

235. Defendant Lynch was not merely acting as an attorney providing independent legal advice concerning facts supplied by a client; instead Lynch knowingly participated in the wrongful conduct described herein.

236. Lynch's actions were undertaken knowingly and intentionally and were not merely the legitimate exercise of advocacy on behalf of a client.

237. To the extent Defendant Lynch participated in the creation, procurement, transmission, or use of false evidence or false documents outside the protected exercise of advocacy, such conduct constituted independent tortious non privileged protected conduct as alleged herein.

**WHEREFORE,** Plaintiff requests judgment against Defendants for compensatory damages, consequential damages, punitive damages., costs, and such other relief as the Court deems proper.

**Count 8 - Fraud, Fraudulent Representation(s), and Civil Conspiracy**

**Plaintiffs sue the following Defendants: Daniel Lynch, Steven Ivankovich, Dr. Olga Ivankovich, and Nancy Webber**

238. The allegations contained in complaint ¶ 1-237 are incorporated herein as if more particularly set forth.

239. Defendants knowingly made the false statements to the police.

240. Defendants knowingly participated in the fraud and conspiracy of back dating documents.

241. Defendants when confronted with the lack of authority to file three civil complaints and a criminal complaint against Plaintiff doubled down and used the back dated document in an attempt to "legitimize " the wrongfully filed complaints.

242. Each defendant conspired with one another and aided and abetted the fraud.

243. The fraudulent misrepresentations were material.

244. The intended recipients, law enforcement, judges, and the AAA arbitrator relied on the forged, back dated document(s) to the detriment of Plaintiff.

245. This conduct set forth herein, is a pattern of fraud participated in by defendants Daniel Lynch, Nancy Webber, Steven Ivankovich, and Olga Ivankovich.

246. Plaintiff suffered damages as a direct and proximate result.

247. Defendants' fabrication of evidence, knowingly false criminal accusations, and coordinated conduct, constitute circumstances supporting punitive damages to the extent permitted by Florida law.

**WHEREFORE,** Plaintiff requests judgment against Defendants for compensatory damages, consequential damages, punitive damages., costs, and such other relief as the Court deems proper.

**Count 9 - Fraud**

**Plaintiffs sues the following Defendants: Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to collectively as ("Pilgrim" or "P-5"); Overlook Managing Member LLC ("Overlook); Portfolio 2 Managing Member LLC ("P-2"); Tyler Atlas LLC; Atlas Holdings Investment LLC; Consilient Holding Investments LLC ("Consilient"); Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC;(the owner of a condominium located at 401 North Wabash unit 55 A Chicago IL. Known as the "Trump Condominium"). Vandelay Mortgage Fund 1 LLC (Vandelay) North American Property Ventures LTD a**

**Grand Cayman organized entity; Dr. Olga Ivankovich; Nancy Webber; Steven Ivankovich; Rodney Balais; and David Morris**

248. The allegations contained in complaint ¶ 1-247 are incorporated herein as if more particularly set forth.

249. Each of the LLC defendants is the alter ego of Steven Ivankovich.

250. Defendant Nancy Webber was introduced to Atlas Group and Steven Ivankovich when she was working in the Stiffel group under the direction of David Morris.

251. David Morris is a lifelong friend of Steven Ivankovich. He was employed in several investment banks, including Stiffel.

252. David Morris had his trading license revoked by FINRA.

253. David Morris, Nancy Webber, and Steven Ivankovich, conspired to transfer Atlas funds through journal entries, to LLCs owned and controlled by Steven Ivankovich.

254. When the Stifel accounts were transferred to Celadon, David Morris executed the account opening statements as an authorized trader for the Celadon accounts enumerated hereinabove. When the opening account documents were executed, David Morris's FINRA licenses had been permanently revoked.

255. Defendants Nancy Webber, Steven Ivankovich, Rodney Balais, Dr. Olga Ivankovich had actual knowledge that David Morris's FINRA licenses was revoked.

256. In 2025, as part of the chapter 11 plan, the Celadon investment accounts were transferred to RBC. The chapter 11 Plan required that the accounts be subject to the sole authority of Stuart Neiberg, the Disbursing Agent.

of Jeanette Ivankovich to the motion to vacate the appointment of a receiver by the divorce court.[11]

120. Steven Ivankovich used sycophants to disguise that he was the "puppet master." Those sycophant's included Nancy Webber, David Morris, Rodney Bailas, Dr. Olga Ivankovich and others. Steven Ivankovich directed them to withdraw funds, hold membership interests in their names, pay Steven Ivankovich's monthly bills from money misappropriated from his own father, Dr. Anthony Ivankovich's account(s), pay his credit card bills that averaged $100,000 per month, all of which were all in the name of Dr. Anthony Ivankovich.

121. Plan confirmation required that Steven Ivankovich confirm that post confirmation he would not mange any debtor or plan guarantor, specifically Yacht Daddy LLC and the P-5 Texas LLCs. Dr Olga Ivankovich testified that Steven Ivankovich would have no management or officer role post confirmation. Mark Brown would confirm same as the asset manager and person with the sole right to operate, manage, refinance, day to day oversee operations, and sell the Texas properties.

122. The forgoing representations were either not true when made, or that Dr. Olga Ivankovich believed the representations were true when made but subsequently ceded all control to Steven Ivankovich. Steven Ivankovich exercised his control to have "Galaxy", the PE lender on the P-2 property that was sold, transfer in excess of $1,000,000 that Galaxy was holding in escrow as an undisclosed debtor asset. The transfer was arranged by Steven Ivankovich post confirmation and diverted from a

[11] An exhibit registrar and Exhibits will be docketed separately and may be docketed under seal once an appropriate court order is entered.

management account, and his father's pension account wiring money sent to an Oceanforce Marine account; then directs defendant Balais how to disburse said funds.

265. Nancy Webber actively participated in this fraud. She is the contact person with RBC and assists defendants in transferring funds in and out of the LLC accounts and Dr. Anthony Ivankovich's accounts. She has actual knowledge that Dr. Anthony Ivankovich, prior to his passing, was not competent to and did not make deposits or disbursements from said accounts.

266. Dr. Olga Ivankovich had actual knowledge that Steven Ivankovich was impersonating Dr. Anthony Ivankovich, withdrawing funds from his father's accounts, and even pledging account securities as a vehicle to purchase assets, including assets owned by some of the Defendant LLCs.

267. Plaintiff is a creditor of the LLC defendants. Plaintiff, as General Counsel, as authorized by his engagement agreement, retained local counsel on behalf of particular LLCs. Those local counsel universally are owed fees by the LLCs that they represent, and or by Dr. Anthony Ivankovich and Dr Olga Ivankovich.

268. Steven Ivankovich actually paid, and is paying Nancy Webber, David Morris, and Rodney Balais with misappropriated funds, purchased a home for David Morris and to disguise the payoff had the home titled in the name of Turtle Way LLC. Nancy Webber, unknown to her was named as an officer of Turtle Way LLC. David Morris, although he had a permanent FINRA suspension, is still paid $16,500 per month from funds misappropriated from his Dr. Ivankovich accounts or accounts by Steven Inavkovich, owned by the defendant LLCs. As an additional payoff to David Moriss, Steven Ivankovich arranged and used his parents accounts to purchase David Morris a home

whose address is 200 Waterway Road Apartment 208 Tequesta, FL. 33469. The defendants in an attempt to defraud creditors, including Plaintiff, hid the purchase by titling the property in the name of Turtle Way LLC.

269. Each of the defendants aided and abetted the conspiracy.

270. The intended result of the fraud and the conspiracy in aiding and abetting same was to remove assets from the reach and the ability of Plaintiff and the LLC creditors to satisfy their respective claims.

271. Defendants actually formed, operated, and still operate a "criminal enterprise."

272. Defendants committed or aided and abetted the commission of wire fraud, forgery, elder abuse, identity theft, civil theft, income tax evasion, perjury, bank fraud, bankruptcy fraud, and obstruction of justice.

273. Steven Ivankovich created a Cayman entity known as North American Fund LLC. Although he represented, he was not an owner, the representation was not true, because in truth and fact he was and is the sole member of North American, simply a depository alter ego of his.

274. North American was created on December 7, 2022. On that day 100% of the membership interests were assigned to Steven Ivankovich.

275. Plaintiff, although General Counsel, was a victim of the fraud. Plaintiff provided full time exclusive legal services to the LLC defendants, who used the services but never intended to pay for the services. Defendants' in fact fraudulently stole four years of legal services.

276. Steven Ivankovich's actions as set forth herein rendered him insolvent. Hiding behind the multi-tiered corporate structure, he maintained 100% control of all LLC

assets, and as he planned, used that control to defraud Plaintiff and then remove the assets from Plaintiff's ability to satisfy his lawfully earned fees claims from those assets.

277. Plaintiff suffered damages as a direct proximate cause of the fraud herein alleged.

278. Plaintiff suffered damages as a direct proximate cause from defendants David Morris, Nancy Webber, Olga Ivankovich, Rodney Balais aiding and abetting the fraud.

279. Each of the defendants named in this count derived, participated in, conspired with, and aided and abetted the fraudulent conduct.

**WHEREFORE,** Plaintiff requests judgment against Defendants for compensatory damages, consequential damages, punitive damages., costs, and such other relief as the Court deems proper.

**Count 10 - Conspiracy**

**Plaintiffs sues the following Defendants: Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to collectively as ("Pilgrim" or "P-5"); Overlook Managing Member LLC ("Overlook); Portfolio 2 Managing Member LLC ("P-2"); Tyler Atlas LLC; Atlas Holdings Investment LLC; Consilient Holding Investments LLC ("Consilient"); Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC, the owner of a condominium located at 401 North Wabash unit 55 A Chicago IL. Known as the "Trump Condominium"; Vandelay Mortgage Fund 1 LLC (Vandelay); North American Property Ventures LTD a**

**Grand Cayman organized entity; Dr. Olga Ivankovich; Nancy Webber; Steven Ivankovich, Rodney Balais; and David Morris**

280. The allegations contained in complaint ¶ 1-279 are incorporated herein as if more particularly set forth.

281. The LLC defendants are alter egos of Steven Ivankovich.

282. Each of the defendants conspired with Steven Ivankovich to defraud Plaintiff, the "local firms" engaged to represent many of the LLCs, and the creditors of Steven Ivankovich.

**WHEREFORE,** Plaintiff requests judgment against Defendants for compensatory damages, consequential damages, punitive damages., costs, and such other relief as the Court deems proper.

**Count 11 - Aiding and Abetting Fraud**

**Plaintiffs sues the following Defendants: Pilgrim Caribbean Isle LLC; Pilgrim Forest Park LLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Pilgrim Coulter Owner LLC; Pilgrim Warwick Owner LLC; Pilgrim Windtree Owner LLC, hereinafter referred to collectively as ("Pilgrim" or "P-5") ;Overlook Managing Member LLC; ("Overlook) Portfolio 2Managing Member LLC ("P-2"); Tyler Atlas LLC; Atlas Holdings Investment LLC; Consilient Holding Investments LLC ("Consilient"); Yacht Daddy LLC; Saucer Sled LLC; Matt Realty Ventures LLC; Scranton Investments S.R.L. an entity organized under the laws of the Dominican Republic the owner of real property knowns Punta Alma; Downtown Property Ventures LLC, the owner of a condominium located at 401 North Wabash unit 55 A Chicago IL. Known as the "Trump Condominium"; Vandelay Mortgage Fund 1 LLC ("Vandelay"); North American Property Ventures LTD a**

**Grand Cayman organized entity; Dr. Olga Ivankovich, Nancy Webber Steven Ivankovich, Rodney Balais, and David Morris**

283. The allegations contained in complaint ¶ 1-282 are incorporated herein as if more particularly set forth.

284. The LLC defendants are alter egos of Steven Ivankovich.

285. Each of the defendants aided and abetted Steven Ivankovich to defraud Plaintiff, the "local firms" engaged to represent many of the LLCs, and the creditors of Steven Ivankovich.

**WHEREFORE,** Plaintiff requests judgment against Defendants for compensatory damages, consequential damages, punitive damages., costs, and such other relief as the Court deems proper.

**Count 12 - Fraudulent Conveyance Fla Stat. UFTA §§ 726.101**

**Plaintiffs sue the following Defendant: North American Venture Fund LTD**

286. The allegations contained in complaint ¶ 1-285 are incorporated herein as if more particularly set forth.

287. Plaintiff is a creditor of Steven Ivankovich and Overlook Managing Member LLC.

288. Plaintiff was a creditor of Overlook and Steven Ivankovich on the date that transfer of the membership interest was made.

289. On or about December 7, 2022 (the "effective date") Steven Ivankovich transferred all of his membership interests in Overlook Managing Member LLC to defendant North American Venture Fund LTD.

290. Steven Ivankovich individually owned a 93% membership interest in Overlook on the date of the transfer of the membership interests.

291. Overlook owned 100% of the membership interests of the five Pilgrim properties known as P-5.

292. On the date of the transfer, three Pilgrim properties known as Pilgrim Warwick, Pilgrim Coulter and Pilgrim Windtree, had a fair market value of $33,000,000.

293. On the date of the transfer, Steven Ivankovich was insolvent, and on the date of the transfer of his membership interest in Overlook, same was made to an insider.

294. On the date of the transfer, Steven Ivankovich owned 100% of the membership interests in North American Venture Fund LTD.

295. The transfer by Steven Ivankovich of his membership interests in Overlook was done with the actual intent to hinder, delay, and defraud Plaintiff, and other creditors of Steven Ivankovich, as defined in Fla. Stat. § 726.105 (1)(a).

296. The transfer was made for no consideration.

297. The transfer of the membership interest was fraudulent. Steven Ivankovich through his ownership of North American, retained 100% control of the Overlook membership interests. When the transfer of the Overlook membership interest was made Steven

Ivankovich had executed under the penalties of perjury an affidavit that he was insolvent.

298. Steven Ivankovich, subsequently testified in court proceedings and deposition in aid of execution conducted by a creditor of Steven Ivankovich, that he was not solvent, had no income, and was supported solely by his parents.

299. At the time of the transfer, Steven has admitted he was insolvent as that term is defined in Fla Stat § 726.103.

300. Plaintiff seeks the relief authorized by § 726.

Wherefore, Plaintiff requests that the court:

A. Enter a judgement determining that the transfer of the membership interests in Overlook Managing Member LLC to North American are void.

B. Enter an order voiding the transfer.

C. Impose a constructive trust on the Overlook Managing Member LLC membership interests.

D. Appoint a Receiver to sell the Overlook Managing Member LLC membership interests.

E. Instruct the Receiver to pay Plaintiff's legal fees in the amount of $1,960,000 plus pre and post judgment interest costs and reasonable legal fees from the sale proceeds.

F. Order that after the payment of the Receiver's reasonable legal fees and costs of the proceeding, that the Receiver retain any net sales proceeds, for the benefit of allowed

claims of the creditors of Steven Ivankovich, including any claim of Jeanette Ivankovich to marital property arising from Steven's membership in Overlook.

G. Such other and further relief as the nature of Plaintiff's cause may require.

**Count 13 - Fraudulent Conveyance Fla Stat. UFTA §§ 726.101**

**Plaintiffs sue the following Defendant: Downtown Property Ventures LLC**

301. The allegations contained in complaint ¶ 1-300 are incorporated herein as if more particularly set forth.

302. Plaintiff is a creditor of Steven Ivankovich.

303. Plaintiff was a creditor of Steven Ivankovich on the date that he acquired a 100% membership interest in Downtown Property Ventures LLC.

304. On or about November 23, 2022, Steven Ivankovich contracted to purchase Unit 55A at the Trump Tower located at 401 North Wabash in Chicago, Illinois ("Trump Condo"). Rather than hold title in his individual name, he formed the entity Downtown Property Ventures LLC "Downtown", and the Trump Condominium was deeded to Downtown.

305. Steven Ivankovich owned 100% of the membership interests in Downtown.

306. On the date of the transfer Steven Ivankovich was insolvent.

307. The transfer by Steven Ivankovich of his ownership interest in the Trump Condominium and his 100% ownership of the membership interest in Downtown was

done with the actual intent to hinder, delay, and defraud Plaintiff, and other creditors of Steven Ivankovich, as defined in Fla. Stat. § 726.105 (1)(a).

308. The transfer was made for no consideration.

309. The transfer of the Trump Condominium and titling the ownership interest in Downtown was fraudulent. Steven Ivankovich, through his ownership of Downtown, retained 100% control and de facto ownership of the Trump condominium.

310. When the property was purchased and Downtown was created Steven Ivankovich had executed under the penalties of perjury an affidavit that he was insolvent.

311. Steven Ivankovich subsequently testified in court proceedings and a deposition in aid of execution conducted by a creditor of Steven Ivankovich that he was not solvent,

had no income, and was supported solely by his parents. At the time of the transfer he admitted he was insolvent as that term is defined in Fla Stat § 726.103.

312. Plaintiff seeks the relief authorized by § 726.

Wherefore, Plaintiff requests that the court:

A. Enter a judgement determining that Downtown is the alter ego of Steven Ivankovich

B. Enter an order voiding the transfer of the Trump property to Downtown was fraudulent and that Steven Ivankovich legally owns the property.

C. Impose a constructive trust on the membership interests or Downtown.

D. Appoint a Receiver to sell the Downtown membership interests.

E. Alternatively order the Receiver to sell the Trump condominium .

F. Instruct the Receiver to pay the Plaintiff's legal fees in the amount of $1,960,000 plus pre and post judgment interest costs and reasonable legal fees from the sale proceeds.

G. Order that after the payment of the Receiver's reasonable legal fees and costs of the proceeding, that the Receiver retain any net sales proceeds, for the benefit of allowed claims of the creditors of Steven Ivankovich, including any claim of

Jeanette Ivankovich to marital property arising from Steven's membership in Overlook.

H. Such other and further relief as the nature of Plaintiff's cause may require.

**Count 14**

**Fraudulent Conveyance Fla Stat. UFTA §§ 726.101**

**Plaintiffs sue the following Defendant: Mat Realty Ventures LLC**

313. The allegations contained in complaint ¶ 1-312 are incorporated herein as if more particularly set forth.

314. Plaintiff is a creditor of Steven Ivankovich.

315. Plaintiff was a creditor of Steven Ivankovich on the date that he acquired a 100% membership interest in Mat Realty Ventures LLC. On or about February 16, 2023, he purchased real property known as 866600 Overseas Highway, Islamorada, Florida. In order to avoid his creditors, including the Plaintiff, and future creditors including the Plaintiff's accruing legal fees, he

created the entity known as Mat Realty Ventures LLC. Mat Realty was deeded the property known as 86600 Overseas Highway . The consideration paid for the property was $6,250,000.

316. Steven Ivankovich, through his ownership of North American which is alleged to be the owner of 100% of the membership interests in Mat Realty, owned 100% of the membership interests in Mat Realty.

317. The real de facto owner of Mat Realty and North American is Steven Ivankovich. Said entities are his alter egos.

318. On the date of the transfer of the membership interests, Steven Ivankovich was insolvent.

319. The titling of the ownership interest of Steven Ivankovich in Mat Realty by Steven Ivankovich was done with the actual intent to hinder delay and defraud Plaintiff, and other creditors of Steven Ivankovich, as defined in Fla. Stat. § 726.105 (1)(a).

320. The transfer was made for no consideration.

321. The transfer of the real property and the titling of the ownership interest in Mat Realty was fraudulent. Steven Ivankovich through his ownership of Mat and North American retained 100% control and de facto ownership of the 86600 Overseas Hwy.

322. When the property was purchased and Mat Realty was created Steven Ivankovich had executed under the penalties of perjury an affidavit that he was insolvent.

323. Steven Ivankovich, subsequently testified in court proceedings and a deposition in aid of execution conducted by a creditor of Steven Ivankovich that he was not solvent had no income and was supported solely by his parents.

324. At the time of the transfer Steven Ivankovich admitted he was insolvent as that term is defined in Fla Stat § 726.103.

325. Plaintiff seeks the relief authorized by § 726.

Wherefore, Plaintiff requests that the court:

A Enter a judgement determining that Mat Realty is the alter ego of Steven Ivankovich.

B. Enter an order voiding the transfer of the Overseas property to Mat Realty was fraudulent and that Steven Ivankovich legally owns the property.

C. Impose a constructive trust on the membership interests of Mat Realty.

D. Appoint a Receiver to sell the Mat Realty membership interests.

E. Alternatively order the Receiver to sell 86600 Overseas Hwy, Islamorada, 33131.

F. Instruct the Receiver to pay the Plaintiff's legal fees in the amount of $1,960,000 plus pre and post judgment interest costs and reasonable legal fees from the sale proceeds.

G. Order that after the payment of the Receiver's reasonable legal fees and costs of the proceeding, the Receiver retain any net sales proceeds, for the benefit of allowed claims of the creditors of Steven Ivankovich, including any claim of Jeanette Ivankovich to marital property arising from Steven's ownership of the property.

H. Such other and further relief as the nature of Plaintiffs relief may require.

**Count 15 - Fraudulent Conveyance Fla Stat. UFTA §§ 726.101**

**Plaintiffs sue the following Defendant: Saucer Sled LLC**

326. The allegations contained in complaint ¶ 1-325 are incorporated herein as if more particularly set forth.

327. Plaintiff is a creditor of Steven Ivankovich.

328. Plaintiff was a creditor of Steven Ivankovich on the date that he acquired a 100% membership interest in Saucer Sled LLC

329. On or about March 12, 2024, Steven Ivankovich purchased real property known as 1102 Beeler Place Copper Mountain, CO 80443. In order to avoid his creditors, including the Plaintiff, and

future creditors including the Plaintiff's accruing legal fees, he created the entity known as Saucer Sled LLC a Colorado limited liability entity to own the real property. The membership interests in Saucer Sled were owned 100% by North American

330. Originally the transaction was to be structured as a loan made by Vandelay, to Saucer Sled and secured by a mortgage in favor of Vandelay. Thus, the transaction would have secured Vandelay and

provided for a repayment of the loan used to purchase the property, which was funded by Steven through accessing his Fathers line of credit with RBC.

331. To avoid repayment of the loan, for no consideration the membership interests in Saucer Sled were titled in the name of North American. As alleged herein above North American was owned 100% by Steven Ivankovich.

332. Through this scheme Steven acquired 100% ownership of the real property, 1102 Beeler Place free and clear of the Plaintiff's past due and accruing legal fees, his other creditor claims, the claim of his Father and now his father's estate, and any marital property claim of Jeanette Ivankovich.

333. Steven Ivankovich, through his ownership of North American which is alleged to be the owner of 100% of the membership interests in Saucer Sled, owned 100% of the membership interests of Saucer Sled.

334. The real de facto owner of Saucer Sled, and North American is Steven Ivankovich. Said entities are his alter egos.

335. On the date of the transfer of the membership interests and on the date of the purchase of the property, March 12, 2024, Steven Ivankovich was insolvent.

336. The titling of the ownership interest of Steven Ivankovich in Saucer Sled by Steven Ivankovich was done with the actual intent to hinder delay and defraud Plaintiff, and other creditors of Steven Ivankovich, as defined in Fla. Stat. § 726.105 (1)(a).

337. The transfer was made for no consideration.

338. The transfer of the real property and the titling of the ownership interest in Saucer Sled was fraudulent. Steven Ivankovich through his ownership of Saucer Sled and North American retained 100% control and de facto ownership of 1102 Beeler Place .

339. When the property was purchased and Saucer Sled was created Steven Ivankovich had executed under the penalties of perjury that he was insolvent.

340. Steven Ivankovich, subsequently testified in court proceedings and a deposition in aid of execution conducted by a creditor of Steven Ivankovich, that he was not solvent, had no income, and was supported solely by his parents. At the time of the transfer he admitted he was insolvent as that term is defined in Fla Stat § 726.103.

341. Plaintiff seeks the relief authorized by § 726.

Wherefore, Plaintiff requests that the court:

A Enter a judgement determining that Saucer Sled LLC is the alter ego of Steven Ivankovich.

B. Enter an order voiding the transfer of the Beeler Place property to Saucer Sled that the transaction was fraudulent and that Steven Ivankovich legally owns the property.

C. Impose a constructive trust on the membership interests of Saucer Sled LLC.

D. Appoint a Receiver to sell the Saucer Sled membership interests.

E. Alternatively order the Receiver to sell 1102 Beeler Place Copper Mountain, Co.

F. Instruct the Receiver to pay the Plaintiff's legal fees in the amount of $1,960,000 plus pre and post judgment interest costs and reasonable legal fees from the sale proceeds.

G. Order that after the payment of the Receiver's reasonable legal fees and costs of the proceeding, the Receiver retain any net sales proceeds, for the benefit of allowed

claims of the creditors of Steven Ivankovich, including any claim of Jeanette Ivankovich to marital property arising from Steven's ownership of the property.

H. Such other and further relief as the nature of Plaintiffs relief may require.

**Count 15 - Fraudulent Conveyance Fla Stat. UFTA §§ 726.101**

**Plaintiffs sues the following Defendant: Turtle Way LLC**

342. The allegations contained in complaint ¶ 1-341 are incorporated herein as if more particularly set forth.

343. Plaintiff is a creditor of Steven Ivankovich.

344. Plaintiff was a creditor of Steven Ivankovich on the date that he and David Moriss created a Florida limited liability entity known as Turtle Way LLC.

345. Steven Ivankovich was the actual owner of Turtle Way LLC, although the "legal" owner of 100% of the membership interests in Turtle Way LLC was David Morris.

346. Turtle Way LLC is the owner of real property known as 200 Waterway Road Apartment 208 Tequesta FL. 33489.

347. Steven Ivankovich purchased the property and created two fraudulent owners: first was title owner Turtle Way LLC, and second was David Morris, who represented to the public, and Steven Ivankovich creditors, that he owned 100% of the membership interests in Turtle Way LLC.

348. David Morris paid no consideration to purchase the property.

349. The property was titled in the name of Turtle Way LLC to hinder, delay, and defraud the creditors including Plaintiff.

350. Originally, the Florida Division of Corporations disclosed only David Morris as having any interest in Turtle Way LLC. Eventually, Steven Ivankovich disclosed his actual interest in Turtle Way LLC when he disclosed that he was Vice President. Interestingly, defendant Nancy Webber also was

disclosed as an officer of Turtle Way LLC, an interest that she, pursuant to her deposition testimony, under oath, denied having any knowledge of.

351. The entire scheme of titling the property in the name of Turtle Way LLC was fraudulent. If David Morris paid any consideration, it was for the services he rendered in aiding and abetting the fraud and criminal conduct as set forth herein above.

352. Through this scheme Steven Ivankovich acquired 100% ownership of the real property - 200 Waterway Place free and clear of the Plaintiff's past due and accruing legal fees, his other creditor claims, the claim of his father / father's estate, and any marital property claim of Jeanette Ivankovich.

353. The real de facto owner of Turtle Way LLC is Steven Ivankovich; his alter egos.

354. On the date of the transfer of the membership interests and on the date of the purchase of the property, Steven Ivankovich was insolvent. His titling of the ownership interest in Turtle Way LLC by Steven Ivankovich was done with the actual intent to hinder, delay, and defraud Plaintiff, and other creditors of Steven Ivankovich, as defined in Fla. Stat. § 726.105 (1) (a).

355. The transfer was made for no consideration.

356. The transfer of the real property and the titling the ownership interest in Turtle Way LLC was fraudulent, as Steven Ivankovich retained 100% control and de facto ownership of the real property.

357. When the property was purchased and Turtle Way LLC was created, Steven Ivankovich executed under the penalties of perjury an affidavit that he was insolvent.

358. Steven Ivankovich, subsequently testified in court proceedings and a deposition in aid of execution conducted by a creditor of Steven Ivankovich, that he was not solvent

had no income and was supported solely by his parents. At the time of the transfer he has admitted he was insolvent as that term is defined in Fla Stat § 726.103.

359. Plaintiff seeks the relief authorized by § 726.

Wherefore, Plaintiff requests that the court:

A Enter a judgement determining that Turtle Way LLC is the alter ego of Steven Ivankovich.

B. Enter an order voiding the transfer of 200 Waterway Place apartment 208 property to Turtle Way LLC, that the transaction was fraudulent and that Steven Ivankovich legally owns the property.

C. Impose a constructive trust on the membership interests of Turtle Way LLC.

D. Appoint a Receiver to sell the Turtle Way LLC membership interests.

E. Alternatively order the Receiver to sell 200 Waterway Way Road apartment 208 Tequesta, FL. 33490

F. Instruct the Receiver to pay the Plaintiff's legal fees in the amount of $1,960,000 plus pre and post judgment interest costs and reasonable legal fees from the sale proceeds.

G. Order that after the payment of the Receiver's reasonable legal fees and costs of the proceeding, the Receiver retain any net sales proceeds, for the benefit of allowed claims of the creditors of Steven Ivankovich, including any claim of Jeanette

Ivankovich to marital property arising from Steven Ivankocivh's ownership of the property.

H. Such other and further relief as the nature of Plaintiffs relief may require.

## JURY TRIAL ELECTION

Plaintiff elects to have this case tried by a Jury.

Plaintiff reserves all his rights to supplement or amend his Initial Complaint as permitted by Florida Rules of Civil Procedure, and any other applicable Orders of this Honorable Court.

GERSHMAN & GERSHMAN
2160 W. Atlantic Avenue, Second Floor
Delray Beach, FL 33445
Desk Telephone: (561) 684-8898
robert@rglawfirm.us
S//Robert Gershman
ROBERT S. GERSHMAN
Fla. Bar No. 917397

# PLAINTIFF'S EXHIBIT 1

**GARY A. GOLDSTEIN P.A.**

Gary A. Goldstein
Admitted Maryland

Maryland Office
111 South Calvert Street
Suite 2700
Baltimore, Maryland 21201
Telephone cell 561-373-0327
Email gary@gagpa.com
Mailing Address:
1710 Lands End Road
Manalapan, FL 33462

September 13, 2022

Mr. Steven Ivankovich

**Re: Engagement Agreement, General Counsel Agreement For Steven Ivankovich Individually and the Atlas Group Limited Liability Companies that are "Managed' By Steven Ivankovich including but not limited to: Pilgrim Caribbean Isle LLC; Pilgrim Forrest Park LLC; Pilgrim Windtree LLC; Pilgrim Coulter LLC; Pilgrim Warwick LLC; Alliance HFTL LLC; Overlook Managing Members LLC; Atlas P-2 Managing Members LLC; Ivankovich Family LLC; P-2 Management LLC; Tyler Atlas LLC.**

**NOTE THIS ENGAGMENT LETTER CONTAINS PRIVILEGED MATTERS AND IS SUBJECT TO THE ATTORNEY CLIENT PRIVILEGE.**

Via: E-mail Attachment Only

Dear Steven:

This engagement letter, long overdue, is an attempt to provide a general outline of the legal and consulting services that I have been and will continue to provide to you individually and the family of limited liability companies in which you have a management or ownership interest. The above referenced list of "LLC'S" is not exhaustive because of the sheer number of interests of each entity. To appreciate a more particularized outline of the matters I am working on see the "status report" dated August 15, 2022, attached. Even this status report is somewhat out of date as new matters arise.

Although unusual to be included in an engagement letter I believe it to be appropriate to comment on the situation that I am and have been in for the past year acting as "de facto" General Counsel for you and the LLC's. During this period and as we proceed forward I have declined to represent most other clients as I simply do not have the time to devote to any new matters other than my obligations to you and the LLC's. This engagement letter will confirm my authority to continue in the capacity as General Counsel until such time as we mutually agree to terminate that relationship. To keep termination simple, either of us can terminate the General Counsel or legal relationship by providing 30 days e-mail notice to the other party.

The purpose of this letter is to establish the terms of my representation of you., the LLCs, and of course my association with Jason Wandner, as Florida and Trial Counsel.

As you know I am admitted to practice in Maryland, I am not admitted to practice in Florida. I do not have a law firm located in Florida although I reside in Florida. Almost all the LLCs are incorporated in Delaware, and have property interests or pending matters in New York California, Illinois, Florida, Dominican Republic and multiple other jurisdictions. The activities are not limited to Florida. Once again I refer to the Status Report.

In some of the matters I will associate with Jason Wandner as trial or "local" counsel. In essence in many areas consistent with the Rules of Professional conduct of our respective Bar Associations Jason and I will share and divide the responsibilities and workload as if we were a single law firm. To be clear my role will be as "Lead Counsel" and General Counsel for you and the LLC's,. This means that I on behalf of the LLCs and you individually consult and direct all other lawyers or law firms engaged on the status matters or new matters that are added. I answer to you, and Mark Brown as applicable. Your execution of this engagement letter confirms *my* authority.

It is difficult to quantify the amount of time that will be required. You are aware that during the past year I have spent substantially full time on all the matters. Overall, I believe we have achieved a successful record. Had we had the opportunity to be engaged earlier I believe we would have prevailed before Judge Coleman in the ZZH / Lee case.

For the past year I have been keeping fairly accurate time records, I use my time records more as notes on what I am working on and what I want to do, as well as "billing" records. I never liked billing by the hour, I always believed when working with entrepreneurs "results accomplished" not "time" was the standard to determine legal fees.

I propose the following terms of engagement:

1. **Nature of Legal Services.** I will acts as General Counsel for you and the LLCs in all matters, including but not limited to those matters listed in the status report. I will also engage Jason Wandner as Florida and Trial counsel and Jason's services are included in this engagement letter, My services will include general business consulting as you request and within my area of expertise.

2. **Term Of Agreement:** Because I will not be accepting any other matters, for what I estimate is the next year, this engagement is for a term of one year. It may be terminated earlier of course by mutual agreement. If an earlier termination we will agree on compensation due through the date of termination.

3. Fees for Services.
   a) I will be paid a fee of $25,000 per month for the first six months commencing October 1, 2022, through March 1, 2023. Subsequent to March 2023, the monthly fee will be reduced to $20,000 for six- month term April 1, 2023,

through September 1, 2023. The basis for the reduction is the expectation that many of the litigation matters set forth in the status report will be resolved by April 1, 2023. The monthly retainer fee will include the services of Jason Wandner.

b) Extraordinary Matters and Contingencies: It is extremely difficult at this to accurately anticipate the time that we will required to spend on these matters. For the purpose of this engagement, I have budgeted 25 hours per week and a discounted rate of $400.00 per hour. You can do the math and see that at a 100 hours per month the fees even discounted would be $40,000 per month if I only spend 25 hours per week on these matters. I have been devoting many more hours per week for the last five months. For this reason, periodically we mutually agree to discuss and agree upon a reasonable result accomplished semi-annual payment. We both agree to use good faith to determine the amount. In considering the amount of such a payment we will consider the actual hours incurred and amount of recovery or settlement "savings".

c) Recovery of Fees: In certain matter for my representation, we will seek reimbursement from the opposing party of reasonable counsel fees and costs. In the event of a recovery the fees due to me will be credited with any recovery.

3. **Costs and Local Counsel:** In addition to attorneys' fees, you agree to pay for costs and disbursements that have been incurred, including, without limitation, filing fees, court reporter fees, delivery charges, witness fees, facsimile, copying and postage charges. You also agree to pay reasonable retainers and fees to counsel retained as Local Counsel. In each local counsel matters I will require that "local counsel" submit a sperate engagement letter for you to approve.

4. **Payment of Fees and Expenses.** All monthly payments are due and payable on the first day of the month. We may agree upon a funding to my trust account of certain portion of the monthly engagement fee. In the event that we do fund the trust account, I will charge said account on the first day of every month.,. We will work with you to resolve any dispute in a mutually acceptable manner. We will not charge you for any of the time necessary to review the invoice, answer your questions pertaining to the invoices, and explain any of the items you question and/or resolve any disputed charges. Such disputes will not adversely affect the ongoing case effort.

5. **Mutual Right to Terminate Relationship.** Of course, every client has the right to terminate our representation at any time for any reason. We have the same right upon giving the client reasonable notice so that suitable arrangements can be made by the client to obtain alternate representation, in accordance with the Rules of Professional Responsibility governing the Maryland Bar. Among the reasons for which we may terminate the representation are: (l) nonpayment of our fees, charges, or costs; (2) the client's failure or refusal to be forthright, cooperative, and supportive of our efforts; (3) the client's misrepresentation of, or failure or refusal to disclose material facts; (4) the client's failure or refusal to accept our advice; or (5) any other

reason permitted or required under the Rules of Professional Responsibility governing the Maryland Bar. The Rules of the Florida Bar will apply to the representation of Jason Wandner.

1. **Commencement of Representation.** If the foregoing is agreeable to you, please acknowledge your understanding and agreement by signing and returning a copy of this letter agreement.

2. **Fee Dispute:** The jurisdiction and venue for any fee resolution shall be Baltimore, Maryland. The Parties shall submit to binding arbitration under the rules of the American Arbitration Association. The law of Maryland shall apply and the laws and rules of the Maryland Bar shall be applicable to this Agreement.

**Conflict of Interest:** This engagement letter is for my representation of Steven Ivankovich, and all the Managed LLC's. I also have been representing a related judgment creditor of Steven Ivankovich with the knowledge and consent of Steven Ivankovich and the LLC's. Jason and I have disclosed all potential conflicts of interest arising from our representing Steven Ivankovich and the LLC's. Both Steven Ivankovich and the LLC's by executing this engagement letter expressly acknowledge that they have been informed of the potential conflict of interest and waive any conflict of interest. If a irreconcilable conflict of interest arises we will notify you and the LLC's and decide on the ethically proper manner to continuing the legal representation.

. Please sign a copy of this letter in the space provided below, indicating your agreement to the terms and conditions set forth above. When you sign this engagement you are signing individually and as Manager for all the Limited Liability Companies set forth in the caption of this letter.

This engagement does not include any billing for the time period April 1, 2022 through September 30, 2022. I will bill that separately, I was waiting the release of the Walker & Dunlop reserve funds because I did not want to further complicate the LLCs cash flow issues, caused by the freezing of the Walker Dunlop reserves.

Very truly yours,
/s/
Gary A. Goldstein

ACKNOWLEDGED AND APPROVED BY:

______________________________

Dated: September 14, 2022
Steven Ivankovich individually and a Manager of the Listed Limited Liability Companies

**GARY A. GOLDSTEIN P.A.**

Gary A. Goldstein

Maryland Office
111 South Calvert Street
Suite 2700
Baltimore, Maryland 21201
Telephone cell 561-373-0327
Email gary@gagpa.com

**To: Steve Ivankovich; Jason Wandner, All LLCS Managed by Steven Ivankovich, Mark Brown**

**From: Gary Goldstein, Esquire**

**ATTORNEY / CLEINT PRIVILEGED DOCUMENT**

**Re: Outline of pending matters and services being performed by Gary Goldstein and Jason Wandner**

**Dated August 15, 2022**

Note to Steve: The purpose of this document is to outline in one place what we are currently working on. This also will be a reference tool. I think it will be very helpful as we go forward. This is not intended as an "exhaustive list" but just a short working document of the general areas of our representation. I will get you a "formal" "joint" engagement letter authorizing us to continue to represent you and the LLCs on these matters. We should have that in one place and it will contain confirmation of any conflict waiver. Obviously I am only working on your matters. (of course, JW is putting in substantial time we consult on all issues)

**OUTLINE OF PENDING MATTERS AND SHORT SUMMARY**[1]

1. **Steve House Mortgage Foreclosure:**

**I have been coordinating with Eric Sparks Chicago counsel on the foreclosure status. The foreclosure judgment was stricken. Service on Steve was not vacated. There is no longer a foreclosure sale date.**

**The current defaulted mortgage indebtedness is approximately $1,750,000. This consists of $1,500,000 plus say 3 years interest at 2.8% three years taxes maybe 2 at $45,000 per year plus some junk stuff. There is a second mortgage held by Steve's Dad approximately $2,000,000 plus accruals. There is a foreclosure judgment against Jeanette who apparently did not defend. She is not on the 5th**

[1] I HAVE TRIED TO KEEP THIS IN SOME COGENT ORDER BUT NOT IN ORDER OF PRIORITY

**Third mortgage that is being foreclosed. She is on Dad's mortgage. House owned T by E. I have offered on behalf of Dad to buy the first for $1,500,000. No response yet.**

2. **Walker Dunlop Citations and Reserve Accounts:**

**Walker Dunlop held back the reserve accounts after the P-2 closing. There is approximately $1,550,000 in those reserve accounts. Walker Dunlop argues it does not want to be in jeopardy releasing those accounts due to two citations served upon them. One citation is in the Federal ZZH case. The other citation was issued by the Atlas entities KKR judgment against Steve in the amount of $1,500,000 (Est). Original case,** *Atlas Huntington Ridge, LLC et al. v. Atlas Apartment Homes LLC, et al.*, 19 L 454 (Cir. Ct. CkCnty) Note: we may try to settle this judgment.

**Walker Dunlop has filed a motion before Judge Coleman asking her to tell them what to do. Walker Dunlop is not fighting us on the law or facts. Michael Debre is local Ill. Counsel for the LLCs. We have filed a motion to secure the funds release /citation quashed before Judge Coleman. Same in Chicago State Court. Judge Coleman did not rule at the last hearing. This may have been intentional because she wants to hear testimony from Steve. That hearing for Steve's deposition in aid of execution is now scheduled for August 31, 2022. In the Chicago case they are on a briefing schedule. Same law firm represents the Atlas/KKR creditor in Chicago case and ZZH in Federal case. We are working with Michael D. to put together an evidence book for a mini trial on 8/31/22 so there is evidence before her that the reserve accounts are not Steve's individually owned assets. Time consuming but we have to get this "evidence " in the record to force an order quashing the citation or at least unfreezing the reserve accounts. I am also working on affidavits probably signed by Shanna and maybe MB.**

**I expect that funds will be released through a Judge Coleman order. This should also end the Chicago Atlas case because of collateral estoppel.**

3. ***P5 GRC /Gary R. New York Supreme Court Complaint:***

**This is a complaint filed by P5 whose managing member is Gary R. The complaint alleges many counts. Bottom line Gary R alleges P5 owns a 7% interest in Overlook Managing Members LLC. Steve owns 93%. I have reviewed the operating agreement that is what it says. Gary R wants an accounting plus and more important his 7% of the net sale proceeds for the 2 Florida apartments sold in Florida (P-2). He calculates that at $4,8[illegible],000 plus if you add in the value of the three Texas properties that now have no mortgage we have to be careful. I have all the closing documents and relevant operating agreements. NOTE to Steve. We discussed that Ravi actually had a 3.5% interest so that Gary R membership interest is 3.5 %. You acquired the Ravi 3.5%. Is there documentation? Where can we find it? Would help in defense of NY case even if that case is dismissed due to lack of jurisdiction.**

**We have retained NY counsel who have been paid a retainer. I signed with authority the engagement letter for the defendants. Steve has not been served individually (I think).**

**This will be very active litigation. Jason and I will pro hac vice into the case.**

4. ***Overlook Asset Management LLC / Arbitration:***

This is related to P 5 but completely different issue. Gary R through Overlook as asset manager of P-2 is claiming a .6% commission for the Walker Dunlop refinance. I have details from Mark. I have a preliminary scheduling conference with AAA on 8/17/22. This also will be real litigation. I believe it is proper that it go to arbitration and we should not fight that by filing a declaratory judgment action, for many reasons.

We will push for all litigation rights in arbitration, depositions discovery etc. I tried to make this easier by merging this case with the NY case but Gary R. lawyers declined . So now we litigate. We may want to file a counterclaim for mismanagement and damages, negligence breach of contract.

I have the financial files from Shanna and we can present a bone-fide defense and claim of breach of the management agreement. I have spoken with Mark about this and he agrees with the merits of a defense of mismanagement. I have the operating agreements of all the LLCs and Gary D management agreement and both Walker Dunlop first and second loan financing closing documents. Gary D seeking $500,00 + + legal and costs. No local counsel involved we will handle it.

5. ***Township Orlando .***

This is the complaint pending in Superior Court of Los Angeles. It was filed January 2019. The case arises from the Grant of an Economic Interest in P-5 the 2 Florida apartment complexes. The principals are Mathew Gorelik and Benjamin Poirier. I believe Steve was represented by Steve Meister's firm but they withdrew. Steve was represented by DL Piper during the loan negotiations. There currently is a jury trial scheduled for January 2023. The issue in the case is the Plaintiffs suing to recover $4,500,000 plus legal fees (at least $145,000) prior to the case being filed. Plaintiffs allege that pursuant to the Grant of Economic Interest pursuant to which they advanced in 2016 $4,000,000 they had the option to elect the $4,500,000 return rather than equity interest if within a time frame the parties could not reach an agreement on the structure of new LLC.

In 2020 The Plaintiffs & Defendants including Steve executed a settlement agreement. What I interpret the settlement agreement to do is reinstate the original grant of equity economic interest to Township Orlando.

Plaintiffs allege a breach of that settlement agreement. They filed an extensive motion for summary judgment, including affidavits and lengthy statement of the case. They also have filed 1000 plus pages of exhibits, including Steve's deposition. (We don't have a copy).

We have had no access to the Meister files although I have communicated with them. I downloaded basic case pleadings to learn what this all was about. I have also secured documents from Ben Kassis counsel for Plaintiffs who has been very cooperative in discussions that we have had. Among the pleadings and documents that I do have are the complaint, complaint exhibits grant of economic interest, motion for summary judgment statement of facts, settlement agreement and LLC operating agreement for "new" LLC. For the past week I have been "reading" and "thinking". ( Note to Steve I think our bills will be less than Meister and DLA Piper although the agreements were impressive).

**I have arranged for Vonn Christenson a California attorney located in Bakersfield to enter his appearance as CA. counsel. I have tried a large commercial case in Federal Bankruptcy Court Northern District with Vonn. He is very good. He told me he is practicing "part-time" now he started his own company making electric batteries but will do this if JW and I do the heavy lifting.**

**In the case Plaintiffs have subpoenaed the Buyers Closing documents from the sale of the two P-2 properties. Note: I looked at the "deal" documents and it discloses the Galaxy interest. Note 2 Steve it looks like what would have been new LLC was to be capitalized $4,000,000 them $1,000,000 you and therefore economic interest split 80% them 20% you individually.**

**You know the math but my concern you don't want the Plaintiffs claiming an economic interest in say 17% of the net sales proceeds, even after the Galaxy payment.**

**This will be real substantial litigation but we will have opportunities to settle.**

**6. *Citations ZZH /Lee***

**As we all know ZZH /Lee issued citations out of Judge Colemans' Court to multiple entities. This section only deals with Stifel. Stifel initially froze all accounts or at least 14 accounts on which Steve was a signatory. This initially froze $30,000,000.Through litigation we secured an agreement to unfreeze $20,000,000. But Stifel still froze $10,000,000 ( I am rounding).**

**We litigated before Judge Coleman and after several hearings some with minimum notice to us, we were able to secure orders "unfreezing" the accounts. Michael Debre was Illinois counsel. JW & I wanted to have the LLCs represented separately and that strategy worked.. This issue is not over-with. There is still a third motion by ZZH that has not been ruled upon by Judge Coleman. Same issue. They wanted a "new" freeze order but Judge Coleman at the last hearing would not modify the unfreeze order. The Judge did not quash the citations yet she indicated she would rule after Steve's testimony. That is why we thought it prudent to get the funds out of Stifel.**

**Note at the hearing on 8/31/22 The LLCs will be represented by Mike D and Cy Posas, and Steve by JW. I am "directing" so I don't get conflicted out. We have discussed with Mike D me putting together the trial exhibits affidavits etc. This is also part of the Walker Dunlop litigation although really two different sets of documents (Stifel & Walker Dunlop). So very time consuming but we need a complete record. We want to quash the Walker Dunlop and ZZH citations and end it here.**

**7. *Charging Orders:***

**I won't go into the details in this status report. The short version is Pami Grand Too LLC a Delaware LLC owed by A&O LLC (to be documented) purchased a judgment against Steve which was $24,000,000 plus probably $30,000,000 by now, and domesticated hat judgment in Florida. JW arranged for independent FL counsel Aaron Resnick & Mike Greenberg. Lengthy process but certified copies of the original judgment were obtained literally had to have private service go to the Indiana**

Court to get a certified copy of the judgment. That judgment then was filed in Florida domesticating the judgment so that charging orders could be issued.

After a required waiting period we prepared a detailed ex-parte motion for the issuance of charging orders against most of the LLCs which have or had assets of Steve's. The Judge signed the order imposing the charging lien on all of those LLCs. We are now in the process of having Steve served. Once again we have diligently tried to avoid a conflict and maintain a "Chinese Wall" between the LLC interests and Steve individually.

8. ***Stifel Complaint:***

A complaint was filed in the United States District Court for the Southern District of Florida against Stifel, Daniel Scherr ZZH & Lee. The basis of the complaint is the violation by Stifel of the confidentiality and right of privacy that it owed to the LLCs. It violated that right when it disclosed the confidential account information of the 14 LLCS.

When ZZH counsel refused to accept service, I arranged for personal service by Hong Kong counsel on Lee and ZZH this was done. Worth the $2000 service costs. Now ZZH /Lee have to come into Florida and move to strike service and dismiss the case for lack of personal jurisdiction.

This is a serious case and Stifel is taking it seriously. They have filed a motion to transfer with several memorandum and a motion to dismiss with two more memorandum. Basically, they want this case transferred to US District Court Northern District of ILL, and then get Judge Coleman. We are fighting that. We briefed our response and now up to the Judge or Federal Magistrate. My opinion close call but would not be surprised if case transferred to Illinois. Not worse thing as long as we don't get Judge Coleman. Note we really want Florida constitution to apply to the disclosures. Florida cases and constitution really restrict what Stifel did. Of course, if we get there we will have to firm up compensatory damages. This is major litigation we are [illegible] all out.

9. ***Tyler Atlas/ Michael Goldstein:***

There are two loans that Tyler Atlas made [illegible] Goldstein Family Partnership and his other company that has the Big Outdoor Sign. We have been working with Mike D and Will Deeds, and of course Mark Brown. This has gone on for more than a year.

Current status is that as to the building loan the foreclosure complaint has been filed. A Receiver Ryan McNaughton, picked by Mike D, has been appointed. He is collecting rent and trying to secure leases from Michael Goldstein who so far has been cooperative. Mark B. met with Michael G, also with the Receiver. The Receiver just agreed with my suggestion, to support a motion that would order him to turn over net rents as collected. He was told but does not believe that the Tyler Atlas loan would be refinanced by MG and paid off in 45 days. Anyone want to bet

I am coordinating /directing/ orchestrating with Mark B Will Deeds and Mike D and of course Steve. The current debt including accrued interest default interest late fees exceeds $4,200,000. The 2020 appraisal was $5,000,000. So probably a foreclosure and credit bid. I am also working on a "stalking horse" lender contract assuming no payoff say by 9/15/22. So far everyone receptive.

The second Tyler Atlas loan is secured by the sign lease a security agreement and UCC plus lease assignments. Same case. In this case a creditor of MG is seeking the lease payments. ( I have had multiple conversations with creditors lawyer. That creditor bought judgment). Tyler Atlas intervened in that case to prevent MG or the creditor taking the rents. The main lease holder has withheld lease payments approximately $191,000. There is another hearing scheduled and we want the lease payments turned over to Tyle Atlas. I am working with Will and Mike D. Mark on foreclosing the UCC / security interest. They thought wait for turnover order first. This loan also accruing default interest.

Note we all remember the dispute on the release of the mortgage on MG's Boynton Beach house. Mike D drafted a forbearance agreement that under certain circumstances would have deferred default interest and late fees for both loans. MG never signed it. My suggestion hold onto default interest. He also owes legal fees back to the first dispute he never paid those

Note recovery both loans should be $5,600 000 +. We will eventually get there.

10. ***Air Plus:***

This is the lien case pending in Broward County Circuit Court. It arises from the sale of the P-5 Florida properties. There is an estoppel letter on the mechanic lien for $18,000. But they have so far not released the lien. I believe $100.000 held by title company in escrow. Air Plus filed a complaint in Broward County to collect an additional $200,000 in open invoices. JW filed an answer to the complaint and it sits. We can file in that case a motion to compel them to release the lien pursuant to the estoppel letter and receive $18,000. We can also try to settle the entire claim. This is day to day. Once we know your number we will try to settle. Or we will try to settle without a number and recommend or not recommend you settle. In other words, get a commitment from Air Plus. They should have some incentive since they must know the properties sold.

11. ***Other DR.***

General corporate document review. [illegible] agreements submitted by Ernie Ells company and have some thoughts on those, pretty basic.

12. ***Other General:***

There are a number of day-to-day issues basically general counsel stuff. No point listing them they "come & go". Much easier for all of us that we deal with these matters right away like insurance claims, slip fall "push" !, just general corporate.

This category I think is most important because much easier to discuss upfront and then structure. Also, no need to involve big firm until needed so much less expensive.

We are also dealing with open account creditors and the law firms and are trying to settle these cases for discounts.

**NOTE:**

I intended to get this type of outline to everyone for some time but just did not have the time with doing the work. Obviously not taking on any other matters. JW and I are working together as if one firm.

As soon as I have the time I will get out a formal engagement letter. Steve has waived the disclosed potential conflict between himself individually and the LLCS. Most of the line items in this status report concern the preservation of the LLCS interests and the protection of their assets as separate entities from any individual creditor of Steve.

# PLAINTIFF'S EXHIBIT 1

In the

# United States Court of Appeals

## For the Seventh Circuit

---

Nos. 25-2561, 25-2585, 25-2649, & 25-3185

ZHU ZHAI HOLDINGS LIMITED and PETER PUI TAK LEE,

*Plaintiffs-Appellees,*

*and*

JEANETTE IVANKOVICH,

*Intervenor-Appellee,*

*v.*

STEVEN IVANKOVICH,

*Defendant-Appellant,*

*and*

PILGRIM CARIBBEAN ISLE LLC, *et al.*,

*Appellants.*

---

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 1:20-cv-04985 — **Sharon Johnson Coleman**, *Judge.*

---

ARGUED SEPTEMBER 25, 2026 — DECIDED OCTOBER 20, 2026

---

Before BRENNAN, *Chief Judge*, and SCUDDER and TAIBLESON, *Circuit Judges*.

SCUDDER, *Circuit Judge*. In the process of seeking to collect on a default judgment against Steven Ivankovich, plaintiffs Zhu Zhai Holdings and Peter Pui Tak Lee issued citations on various entities to discover Ivankovich's assets. Facing a tangled web of entities, accounts, and assets relating to and surrounding Ivankovich, the district court appointed a Special Master to sort through the facts and post-judgment disputes. The Special Master then did just that, ultimately concluding that particular assets (once held in an escrow account as security for loans) belonged to Ivankovich, and not to one or another of the limited liability companies that laid claim to the same assets. Seeing no error in the Special Master's findings, which the district court adopted, we AFFIRM.

I

A

The underlying dispute involves unpaid loans extended by the plaintiffs to various entities for which Ivankovich guaranteed repayment. After Ivankovich "ignored the litigation," the district court entered default judgment for roughly $4.5 million, and we affirmed. See *Zhu Zhai Holdings Ltd. v. Ivankovich*, No. 21-3038, 2022 WL 1439396, at *1 (7th Cir. May 6, 2022).

Ivankovich again failed to pay. The plaintiffs then issued a number of citations to discover his assets and collect the judgment. Federal Rule of Civil Procedure 69(a) provides for enforcement of judgments and post-judgment discovery in accordance with "the procedure of the state where the court is located"--here, Illinois. Under Illinois law, judgment

creditors are "entitled to prosecute citations to discover assets" under 735 Ill. Comp. Stat. 5/2-1402(a).

The plaintiffs issued one such citation in January 2022 to Walker & Dunlop, a third-party lender that had previously extended about $97 million in loans to two entities that Ivankovich owned or operated—Alliance HTFL LLC and Alliance HTTX LLC—for the purchase of several properties in Florida and Texas. Ivankovich served as the guarantor of the loans. As part of the loan agreement, Walker & Dunlop escrowed about $1.5 million in funds to ensure payment of taxes and insurance for the properties in case the LLCs and Ivankovich defaulted on the loans.

In April 2022, Ivankovich's LLCs sold the Florida properties. The sale yielded enough funds to pay off the Walker & Dunlop loans in full, as well as around $35 million in excess proceeds. With the loans paid off, Walker & Dunlop no longer had an interest in the escrowed funds. In the normal course, Walker & Dunlop would have released the funds to the borrower, but with the plaintiffs' citation pending, it instead froze the previously-escrowed funds awaiting the result of the ongoing court proceedings.

Those proceedings proved to be complex and contentious. Ivankovich seems to own and manage a maze of LLCs, several of which intervened in the post-judgment proceedings. Those LLCs—the two Alliance LLCs, and five LLCs whose names all begin with the word "Pilgrim"—asserted that the previously-escrowed funds could not be used to satisfy the plaintiffs' $4.5 million default judgment because those funds belonged to them and not Ivankovich. Both Walker & Dunlop and the Pilgrim LLCs moved to dismiss the citation, but the district court declined to do so. Facing a chorus of objections

by the multiple LLCs and entities surrounding or affiliated with Ivankovich, the district court made the wise decision to appoint a Special Master, retired U.S. Magistrate Judge Sidney I. Schenkier, to navigate the facts and determine ownership of the previously-escrowed funds.

In due course, Ivankovich's estranged wife, Jeanette Ivankovich, intervened in the district court, asserting that she too had a claim over the previously-escrowed funds. She agreed with the plaintiffs that the previously-escrowed funds belonged to Ivankovich, but asserted that she held a superior interest in at least $600,000 of the funds—the amount of child and spousal support that Ivankovich had failed to pay.

B

After a five-month discovery period and a two-day hearing on the question of whether the funds belonged to Ivankovich or the LLCs, the Special Master issued his report and recommendation, finding that, under Illinois law, the funds belonged to Ivankovich. The Special Master's conclusion was the fruit of substantial diligence, including thorough consideration of the record evidence and witness testimony presented by the parties—all conveyed in great detail and with substantial clarity in his report.

The Special Master explained that under the Illinois citation statute "[t]he judgment creditor has the burden of showing that a citation respondent has assets of the judgment debtor." [illegible] v. [illegible], [illegible] N.E.3d 984, 992 (Ill. App. Ct. 2021). The provisions of the citation statute are to be "liberally construed." *Id.* In line with that liberal construction, the phrase "assets belonging to the judgment debtor" is treated

as "very open-ended." *Nat'l Life Real Est. Holdings, LLC v. Scarlato*, 83 N.E.3d 44, 55–56 (Ill. App. Ct. 2017).

From there the Special Master assessed whether the plaintiffs showed that the Walker & Dunlop previously-escrowed funds were assets belonging to Ivankovich. The Special Master first determined that the funds—absent the citation—would have suffered the same fate as the sales proceeds from the Florida properties in that both would be "released to the seller" and deposited in the Alliance HTFL account.

Finding Ivankovich's treatment of the sales proceeds to be "highly relevant" to the question regarding the funds before him, the Special Master detailed the "complete control" that Ivankovich exercised over those proceeds. In particular, Ivankovich transferred tens of millions of dollars out of the Alliance account and into accounts of two of his other LLCs. From those two accounts, he made payments for a personal credit card, a tennis club membership, rent on a family residence, expenses related to his personal yacht, and attorneys he had engaged in connection with his pending divorce proceedings. In the final tally, these personal expenditures ran more than $2.8 million dollars.

Even more, the Special Master saw no evidence that any third-party LLCs ever complained about Ivankovich's use of those funds for his personal purposes. These facts convinced the Special Master that "but for the freeze of the money held by Walker & Dunlop at the time of the sale of [the Florida] properties," Ivankovich would have exercised "complete dominion" over the previously-escrowed funds. Accordingly, the Special Master found that the funds were Ivankovich's and could be used to satisfy the outstanding default judgment.

creditors are "entitled to prosecute citations to discover assets" under 735 Ill. Comp. Stat. 5/2-1402(a).

The plaintiffs issued one such citation in January 2022 to Walker & Dunlop, a third-party lender that had previously extended about $97 million in loans to two entities that Ivankovich owned or operated—Alliance HTFL LLC and Alliance HTTX LLC—for the purchase of several properties in Florida and Texas. Ivankovich served as the guarantor of the loans. As part of the loan agreement, Walker & Dunlop escrowed about $1.5 million in funds to ensure payment of taxes and insurance for the properties in case the LLCs and Ivankovich defaulted on the loans.

In April 2022, Ivankovich's LLCs sold the Florida properties. The sale yielded enough funds to pay off the Walker & Dunlop loans in full, as well as around $65 million in excess proceeds. With the loans paid off, Walker & Dunlop no longer had an interest in the escrowed funds. In the normal course, Walker & Dunlop would have released the funds to the borrower, but with the plaintiffs' citation pending, it instead froze the previously-escrowed funds awaiting the result of the ongoing court proceedings.

Those proceedings proved to be complex and contentious. Ivankovich seems to own and manage a maze of LLCs, several of which intervened in the post-judgment proceedings. Those LLCs—the two Alliance LLCs and five LLCs whose names all begin with the word "Pilgrim"—asserted that the previously-escrowed funds could not be used to satisfy the plaintiffs' $4.5 million default judgment because those funds belonged to them and not Ivankovich. Both Walker & Dunlop and the Pilgrim LLCs moved to dismiss the citation, but the district court declined to do so. Facing a chorus of objections

In an order entered on August 7, 2025, the district court accepted and adopted the Special Master's report and recommendation and directed him to hold those further proceedings. Three of the four appeals before us challenge this August 7 Order finding that the previously-escrowed funds belonged to Ivankovich. The Pilgrim LLCs filed two of those appeals, and the third came from Ivankovich himself.

Before the Special Master could evaluate whether Jeanette or plaintiffs' claims took precedence, however, the plaintiffs and Jeanette filed a joint motion to disburse the funds, stating that they had agreed to split the funds equally between them. The Pilgrim LLCs sought to stay disbursement pending the outcome of their appeals. The district court denied their motion in a November 14 Order, which eliminated the need for further proceedings and gave way to Jeanette and the plaintiffs' agreed-upon disbursement. The Pilgrim LLCs then filed a separate appeal of the November 14 Order, the last of the four consolidated appeals before us.

## II

Our first obligation is to ascertain whether we have jurisdiction to entertain these appeals. Under 28 U.S.C. § 1291, we have jurisdiction to review "all final decisions" entered by the district court. For purposes of appeal, we treat post-judgment proceedings as "separate, free-standing lawsuits," and evaluate the finality of each separate proceeding. *MedLegal Sols., Inc. v. Premium Healthcare Sols., LLC*, 166 F.4th 657, 655 (7th Cir. 2026).

A post-judgment order reflects a final decision within the meaning of § 1291 if it "resolves all the issues raised in the motion that sparked the post-judgment proceedings." *Solis v.*

*Current Dev. Corp.*, 557 F.3d 772, 776 (7th Cir. 2009). If all that remains by the terms of an order are "ministerial actions" by the court, "finality may exist." *MedLegal*, 166 F.4th at 665 (quoting *Star Ins. Co. v. Risk Mktg. Grp. Inc.*, 561 F.3d 656, 659 (7th Cir. 2009)). Put more directly, a decision is final under § 1291 if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Id.* at 664 (quoting *Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps.*, 571 U.S. 177, 183 (2014)).

The November 14 Order satisfies that standard. The order served as a functional approval of the agreement between Jeanette Frankovich and the plaintiffs to split the funds equally, reaffirming that the Pilgrim LLCs had no remaining stake in the funds. The order therefore resolved the remaining questions left unanswered in the court's August 7 Order and adjudicated all parties' rights in the contested funds. Because the Pilgrim LLCs timely filed their last appeal less than 30 days after the district court's entry of the November 14 Order, we have jurisdiction to hear at least one of these four consolidated appeals. See 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a).

The other three appeals before us present a more complex scenario. These appeals stem from the district court's August 7 Order, in which the district court adopted the Special Master's report and recommendation. By its terms, though, that order contemplated further proceedings on the merits of Jeanette's claim to the contested funds, more than a mere ministerial task. See *MedLegal*, 166 F.4th at 664. Still, any lack of finality in the August 7 Order is not dispositive. Had the Pilgrim LLCs appealed solely from the August 7 Order, we might have had to consider whether their premature appeals could

relate forward under Federal Rule of Appellate Procedure 4(a)(2). See *Brown v. Columbia Sussex Corp.*, 664 F.3d 182, 187–190 (7th Cir. 2011). But the Pilgrim LLCs' subsequent appeal of the November 14 Order secures our jurisdiction over their claims, so even if their other appeals related forward, they would only be duplicative and dismissed all the same. See *Harris v. Sellin Mem'l Hosp.*, 13 F.3d 1082, 1083 (7th Cir. 1994).

As to Ivankovich's sole appeal of the August 7 Order, which also appears to be premature, we conclude we lack jurisdiction on other grounds—his lack of standing. Article III limits a federal court's authority to the resolution of "Cases" or "Controversies." U.S. CONST. art. III, § 2. The doctrine of standing exists to enforce this limitation and requires "that any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). The familiar "triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998) (footnote omitted). "[S]tanding must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 211 (2020).

The injury Ivankovich seeks to redress on appeal is unclear. He plainly lacks a financial stake in the outcome of the supplemental proceedings. Indeed, to assert that he has such a stake would, in essence, be asking us to affirm the district court's decision—an unusual request from an appellant. Put another way, Ivankovich might have standing to assert that the previously-escrowed funds are his, but such an assertion would be self defeating because it would allow the plaintiffs

to recover those funds in partial satisfaction of the unpaid $4.5 million default judgment. And while Ivankovich makes vague reference to his fiduciary duties as the manager of the Pilgrim LLCs, he fails to identify how an adverse outcome results in injury personal to him. See *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 n.1 (1992)). We dismiss Ivankovich's appeal for lack of subject matter jurisdiction.

## III

For the appeals brought by the Pilgrim LLCs, two observations warrant emphasis at the outset. First, Ivankovich wove around himself an intricate web of limited liability companies whose roles and functions remain unclear from the record before us. Regardless, we need not untangle it all to decide these consolidated appeals. Second, the Special Master worked diligently to get to the heart of the issue presented—whether the previously-escrowed funds belonged to Ivankovich. In the final analysis, we see no abuse of discretion, clear error, or legal error in any aspect of his findings.

The Pilgrim LLCs, of course, see things differently. They level several challenges at the Special Master's reasoning, including that the Special Master exceeded the scope of his authority, improperly considered entities not before him, and erroneously ignored that the previously-escrowed funds must have belonged to the LLCs because they were needed to pay property taxes and insurance on the Texas properties that the LLCs still owned. They also assert that the Special Master permitted reverse corporate veil piercing by allowing the plaintiffs to hold the LLCs liable for Ivankovich's debts,

contrary to Illinois and Delaware law. And, finally, they insist that the district court erred by extending citation proceedings without an explicit finding that justice required those extensions. None of these contentions persuade us.

The Federal Rules of Civil Procedure provide that "[t]he court must decide de novo all objections to findings of fact made or recommended by a master." Fed. R. Civ. P. 53(f)(3); see also 52(a)(4) ("A master's findings, to the extent adopted by the court, must be considered the court's findings."). But in interpreting the application of Rule 53(f)(3), we have distinguished between factual findings made by a special master after an evidentiary hearing, and those made without. See *Nat'l Lab. Rels. Bd. v. Neises Constr. Corp.*, 62 F.4th 1040, 1050 (7th Cir. 2023) (reviewing without deference "the Special Master's legal conclusions and all facts found without an evidentiary hearing").

Sound reasons support this distinction: where credibility determinations are central to factual findings, clear error review more appropriately reflects the deference necessary to preserve the value of evidentiary hearings. See *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 396 (2018) (emphasizing that "appellate courts should usually review a decision with deference" where the reviewing court would be compelled to "marshal and weigh evidence, make credibility judgments, and otherwise address ... multifarious, fleeting, special, narrow facts that utterly resist generalization."); *Williams v. Lane*, 851 F.2d 867, 872 (7th Cir. 1988) (stressing that "a reviewing court must show even greater deference to the trial court's findings that involve credibility of witnesses, for only the trial judge can be aware of the variations in demeanor and tone of voice that

bear so heavily on the listener's understanding of and belief in what is said'"). We will therefore take an independent look at legal conclusions reached by the Special Master while reviewing his factual findings only for clear error.

### A

The Pilgrim LLCs insist that the Special Master exceeded the scope of his authority by holding proceedings that were unrelated to the district court's reasons for denying the Pilgrim LLCs' and Walker & Dunlop's motions to dismiss the citation. We disagree. The district court appointed a Special Master to address "issues related to but not limited to the parties['] post-judgment discovery proceedings, the discovery produced thus far, and the location and amount of Judgment Debtor Ivankovich's assets." By its terms, the appointment order was broad, and we see nothing demonstrating that the Special Master exceeded the bounds of his assigned responsibility.

Nor is there any merit to the contention that the Special Master improperly considered certain entities not before the court—the [illegible] Family Dwelling LLC and A&C Family LLC, the two LLCs whose accounts Ivankovich transferred proceed funds to after the sale of the Florida properties. The Pilgrim LLCs identify no authority requiring that a Special Master presiding over supplementary proceedings limit his analysis to the entities before him. Such a limitation would make little sense, as it would handicap a Special Master's ability to follow a paper trail in complex financial transactions that may be choreographed to obscure reality.

In a related vein, the Pilgrim LLCs argue that the Special Master engaged in speculation by concluding that the Walker

& Dunlop funds would be controlled by Ivankovich in the same way that the proceeds from the Florida property sales were. They contend that the sales proceeds are distinct from the previously-escrowed funds because the proceeds were deposited in the Alliance HTFL account, while the previously-escrowed funds were, in Walker & Dunlop's words, "returnable to the Pilgrim LLCs."

But this representation by Walker & Dunlop to the district court was unsupported and indeed at odds with the evidence before the Special Master. That evidence indicated that the previously-escrowed funds would have been "released to the seller" and deposited in the same account that received the net proceeds from the property sale—the Alliance HTFL account. Further, the Pilgrim LLCs, some of whom served as the purported title owners of the Florida properties as of 2019, appear nowhere in the numerous transfers of the 2022 sales proceeds—all meticulously traced by the Special Master and all initiated by Ivankovich. In light of this evidence, we see no clear error in the Special Master's consideration of the 2022 sales proceeds.

Finally, the Pilgrim LLCs argue that the Special Master failed to consider that the previously-escrowed funds were needed to pay for outstanding tax and insurance obligations on the Texas properties the LLCs still own. Here too we disagree. The escrow existed to secure Walker & Dunlop's loan via payment of any outstanding tax and insurance obligations in the event of a default on the loan. So once the loan was fully paid off, Walker & Dunlop had no reason or basis upon which to restrict those funds.

As the Special Master found, Ivankovich exercised "complete dominion" over the funds in his LLCs' accounts and

therefore could have chosen to use the previously-escrowed funds to pay taxes and insurance on the Texas properties, or for some other purpose. The same is true for the millions of dollars in proceeds from the Florida property sales: Ivankovich could have chosen to use those funds for business purposes instead of personal expenses, but he did not. This power of choice—exercised completely by Ivankovich, without objection from the Pilgrim LLCs—is precisely what led the Special Master to determine that the previously-escrowed funds belonged to Ivankovich. We see no clear error in his findings.

3

Next, the Pilgrim LLCs assert that the Special Master and the district court committed legal error in permitting "reverse corporate veil piercing" by making the Pilgrim LLCs liable for the judgment against Ivankovich. The district court and the Special Master rejected this objection, and so do we.

The Special Master explained that efforts to pierce the corporate veil are beyond the scope of Illinois supplementary proceedings. Under Illinois law, "the only relevant inquiries in supplementary proceedings are (1) whether the judgment debtor is in possession of assets that should be applied to satisfy the judgment or (2) whether a third party is holding assets of the judgment debtor that should be applied to satisfy the judgment." *Pro Neurological Servs., Inc. v. City of Chicago Comm'n on Hum. Rels.*, 264 N.E.3d 540, 548, *appeal denied*, 270 N.E.3d 850 (Ill. 2025) (quoting *Pyshos v. Heart-Land Dev. Co.*, 630 N.E.2d 1054 (Ill. 1994)).

We have emphasized that [illegible] supplementary proceedings and actions to pierce the corporate veil "seek

those funds to pay Steven Ivnakovich's bill and support his lavish lifestyle. Nancy Webber is a resident of Illinois who regularly does business in Florida and is an officer of the Turtle Way LLC. Dr. Olga Ivankovich is a resident of Miami Dade County, Florida. As set forth more particularly in the complaint, the individual defendants aided and abetted Steven Ivankovich in bank fraud, bankruptcy fraud, elder abuse, obstruction of justice, conspired with and subordinated Steven Ivankovich's perjury, aided and abetted Steven Ivankovich making fraudulent conveyances to the detriment of the Plaintiff and other law firms retained by Plaintiff to represent many of the defendants, and Steven Ivankovich's creditors. Said individuals conspired with Steven Ivankovich to hide his assets, allowed Steven Ivankovich to impersonate his father Dr. Anthony Ivankovich, and withdraw millions of dollars from Dr. Anthony Ivankovich's bank accounts known as The Royal Bank of Canada Wealth Management Account ending in [redacted] ("RBC"), and from Dr. Anthony Ivankovich's Roth IRA account known as RBC Capital Markets LLC Cust. Ending in [redacted]

18 David Lynch is an attorney who maintains a law firm in Chicago Illinois. Mr. Lynch, in conjunction with Steven Ivankovich and Nancy Webber, defamed Plaintiff by filing a false police report with Cook County law enforcement. Mr. Lynch, in a preplanned and targeted effort, in conjunction with Steven Ivankovich, attempted to use the threat of filing a police report to damage Plaintiff's reputation in order to extort Plaintiff to wire money into a secret bank account owned and controlled by Steven Ivankovich. Thereafter, in further obstructing justice, Mr. Lynch caused two frivolous legal proceedings to be filed against Plaintiff by defendant Tyler Atlas, but whose real party in interest is Steven Ivankovich.

- Ivankovich Family LLC: $1,299,203
- A&O Family, LLC (IL): $904,239
- A&O Family, LLC (FL): $7,533,873.57, and additional investment accounts, with

a collective balance of $9,128,060.84, as of September 30, 2024, in readily liquid cash/investment accounts net payment of secured loans, and before disbursement of the $5,000,000 million loan to the P-5 Record Owners.

98. Defendant Yacht Daddy, LLC is 100% owned by A&O Family (FL). Yacht Daddy, LLC owns a 2023 Sunseeker Yacht, which was purchased for approximately $12,000,000 on December 23, 2022, and was subject to no liens or encumbrances. A detailed discussion of the Yacht Daddy purchase is included in the Disclosure Statement of the Periodic Report on Yacht Daddy, LLC filed on September 20, 2024. Docket No. 105.

99. Yacht Daddy, LLC agreed to be a Plan Funder and liquidate the Sunseeker Yacht to the extent necessary to fund any unsatisfied Allowed Claims asserted against Debtors A&O Family, LLC (IL), Atlas P2 Managing Member, LLC, and Ivankovich Family, LLC. Plaintiff represented defendant Yacht Daddy LLC in negotiating its plan participation and drafting the ships mortgage.

100. Consistent with Steven Ivankovich fraudulently using his father, Dr. Anthony Ivankovich's identity, Steven Ivankovich unlawfully assigned Yacht Daddy LLC membership interests to debtor A&O Family LLC (FL).

101. This assignment was merely a "paper title" intended to defraud Steven Ivankovich creditors, including Plaintiff, and all other law firms, with unpaid invoices for earned services rendered to Steven Ivankovich or the LLCs. The actual control and real ownership of the vessel remained in Steven Ivankovich's name. The funds used to

procedural irregularity under Rule 27(f) or otherwise. For these reasons, we AFFIRM.

GAG_ATLAS_1742

collaterally estopped Plaintiffs' claim for turnover (doc. # 251: 12/16/22 Order at 5). The District Judge found that further proceedings were warranted to determine whether the Third-Party LLCs held Steven's assets (*Id.* at 6). Those proceedings have now taken place, and the evidence presented at the hearing before the Special Master shows that those funds are Steven's assets, which but for the citation he would have controlled and put to personal use.

## CONCLUSION

For the reasons set forth above, the Special Master respectfully recommends that the District Judge (a) rule that the funds held in the Court Registry from the citation to Walker & Dunlop are assets of Steven within the meaning of the citation statute; and (b) direct that further proceedings be conducted to determine whether those funds should be distributed to Plaintiffs or to Jeanette.

Any party may file an objection to this Report and Recommendation within 10 days of this Report and Recommendation being filed (Order Appointing Special Master, 01/19/24, at ¶ 1).

**HON. SIDNEY I. SCHENKIER (RET.)**
**Special Master**
**May 14, 2025**